Bridget O'CONNOR, Plaintiff–Appellant,

v.

James DAVIS, Dr., Rockland Psychiatric Center, and State of New York, Defendants–Appellees.

No. 728 Docket 96–7769.

United States Court of Appeals, Second Circuit.

Argued Jan. 29, 1997.

Decided Sept. 19, 1997.

Craig T. Dickinson, White Plains, NY (Jonathan Lovett, Lovett & Gould, White Plains, NY, on the brief), for Plaintiff–Appellant.

Janine M. Spinnato, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General, New York City, Thomas D. Hughes, Assistant Attorney General, New York City, on the brief), for Defendants–Appellees.

Before: WALKER, PARKER, and HEANEY\*, Circuit Judges.

WALKER, Circuit Judge:

Plaintiff-appellant Bridget O'Connor ("O'Connor") appeals from the May 23, 1996, judgment of the United States District Court for the Southern District of New York (Brieant, *J.*) granting the summary judgment motion of defendants-appellees Rockland Psychiatric Center ("Rockland") and the State of New York and dismissing O'Connor's sexual harassment claims, which were brought pursuant to both Title VII of the Civil Rights Act of 1964, § 706(e), as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and Title IX of Education Amendments of 1972, § 901(a), as amended, 20 U.S.C. §§ 1681, *et seq.* ("Title IX"). For the following reasons, we affirm.

## BACKGROUND

While enrolled as a student at Marymount College ("Marymount"), a private Catholic college located in Tarrytown, New York, Bridget O'Connor majored in social work. As a component of her major, O'Connor was required during her senior year to perform 200 hours of field work at one of several Marymount-approved organizations which, in the past, had included schools, daycare centers, community organizations, correctional facilities, and social service agencies. Marymount arranged for O'Connor to be placed for her senior-year internship with Rockland, a hospital for the mentally disabled operated by New York State. Because this internship was considered to be "work study" for financial aid purposes, O'Connor received, through Marymount, federal work study funds for the time she spent performing her volunteer work with Rockland.

O'Connor's internship with Rockland began on September 20, 1994. The hours O'Connor worked were flexible, although she generally chose to work on Mondays and Wednesdays from approximately 8:00 a.m. to 4:30 p.m. because that schedule did not conflict with her regular Marymount classes. O'Connor regularly attended morning staff meetings with Rockland employees and other volunteers, met with the patients assigned to her both one-on-one and in groups. She then documented the results of these patient sessions in "process recordings" which were given first to her Rockland supervisor, Lisa Punzone ("Punzone"), and then to faculty at Marymount.

Dr. James Davis ("Davis") worked as a licensed psychiatrist at Rockland. Approximately two days after O'Connor began her internship, Davis referred to O'Connor, in her presence, as "Miss Sexual Harassment"—a term Davis later explained was intended, as a compliment, to convey the idea that O'Connor was physically attractive and, as such, was likely to be the object of sexual harassment. O'Connor promptly complained about Davis's comment to Punzone, who explained that Davis made similar comments to her, and that O'Connor should try her best to ignore him.

Not only did Davis continue to address O'Connor as "Miss Sexual Harassment," he added to his repertoire of inappropriate sexual remarks. For instance, on one Monday morning, Davis told O'Connor that she

\* The Honorable Gerald W. Heaney of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

looked tired, and that she and her boyfriend must have had "a good time" the night before. On another occasion, Davis pointed to a picture in a newspaper of a woman dressed only in underwear and announced that O'Connor was the woman photographed. He also suggested to O'Connor (and other women present) that they should participate in an "orgy." Finally, on yet another occasion, Davis told O'Connor to remove her clothing in preparation for a meeting with him; he explained, "Don't you always take your clothes off before you go in the doctor's office?"

O'Connor was apparently not Davis's only target; he also commented regularly on the physical appearance of a number of women employed at Rockland, and directed sexual jokes and sexually suggestive noises at them—particularly, as Davis put it, on occasions when he thought the women "looked very well that day." Davis also made "jokes" about female patients—suggesting in one instance that a women patient would benefit from sterilization and, on another occasion, when considering a woman patient who was an incest victim, stating: "the family that plays together stays together."

Although O'Connor reported a good deal of this conduct to Punzone, Punzone did not report any of O'Connor's complaints to James Wagner, her own supervisor, until January of 1995. And when Wagner learned of O'Connor's encounters with Davis, he, like Punzone, did nothing to remedy the situation.

Also in January of 1995, O'Connor complained to Virginia Kaiser, Marymount's social work field instructor, who in turn brought Davis's conduct to the attention of Madeline Connolly, Rockland's director of social work. Connolly then notified Wilbur T. Aldridge, Rockland's affirmative action administrator, who thereafter investigated O'Connor's complaint.

Finally, at some point in January of 1995, O'Connor left Rockland; however, Marymount arranged for her to complete her internship at another facility.

In March of 1995, O'Connor filed the instant action against Marymount, Rockland, the State of New York, and various Marymount and Rockland employees, alleging, *inter alia*, sexual harassment in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and Title IX, 20 U.S.C. §§ 1681, *et seq.* The action was eventually discontinued against Marymount, Punzone, Wagner, Connolly, and Davis himself. The remaining defendants (Rockland and New York State) moved for summary judgment on several grounds. First, they argued that the plaintiff's Title VII claim should be dismissed because O'Connor was not an "employee" of Rockland within the meaning of Title VII. Second, the defendants argued that the Title IX claim should be dismissed because Rockland was not an "educational institution" as set forth in Title IX. Finally, the defendants argued that O'Connor failed to establish a prima facie case of sexual harassment.

In an opinion and order dated May 20, 1996, the district court granted the defendants' summary judgment motion, agreeing that O'Connor was not an "employee" under Title VII and that Rockland was not an "educational institution" under Title IX.[1] Because of this disposition, the district court did not reach the defendants' assertion that O'Connor failed to establish a prima facie case of sexual harassment.

## DISCUSSION

█ Summary judgment may not be granted unless the court determines that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Because summary judgment was granted against O'Connor, we consider all of the evidence in the light most favorable to her. *See Kracunas v. Iona College*, 119 F.3d 80, 82–83 (2d Cir.1997).

---

1. In a ruling not challenged on appeal, the district court also found that the plaintiff had abandoned the claims she brought pursuant to 42 U.S.C. § 1983.

## I. *Title VII*

O'Connor's first argument on appeal is that the district court improperly concluded that she was not a Rockland employee within the meaning of Title VII. She argues that although she worked at Rockland as an unpaid intern, she nevertheless satisfies the common-law agency definition of "employee." We disagree.

■ The definition of the term "employee" provided in Title VII is circular: the Act states only that an "employee" is an "individual employed by an employer." 42 U.S.C. § 2000e(f); *see also EEOC v. Johnson & Higgins,* 91 F.3d 1529, 1538 (2d Cir. 1996). However, it is well established that when Congress uses the term "employee" without defining it with precision, courts should presume that Congress had in mind "the conventional master-servant relationship as understood by the common-law agency doctrine." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322–23, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992) (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 739–40, 109 S.Ct. 2166, 2172–73, 104 L.Ed.2d 811 (1989)); *see also Walters v. Metropolitan Educ. Enters., Inc.,* —— U.S. ——, ——, 117 S.Ct. 660, 666, 136 L.Ed.2d 644 (1997); *Frankel v. Bally, Inc.,* 987 F.2d 86, 90 (2d Cir.1993).

In most cases where an attempt has been made to discern the contours of the "conventional master-servant relationship," it has been because a court has been asked to consider whether, under a particular statute, a party is an employee or an independent contractor. *See, e.g., Reid,* 490 U.S. at 739–40, 109 S.Ct. at 2172–73 (considering the Copyright Act of 1976, 17 U.S.C. § 101); *Darden,* 503 U.S. 318, 322–23, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992) (considering ERISA, 29 U.S.C. § 1132(a)); *Alford v. United States,* 116 F.3d 334, 337–38 (8th Cir.1997) (considering 26 U.S.C. § 62(a)(1) of the Internal Revenue Code); *Cilecek v. Inova Health Sys. Servs.,* 115 F.3d 256, 260 (4th Cir.1997) (considering Title VII); *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 232 (2d Cir.1995) (considering ERISA). In this context, the Supreme Court has outlined the following factors, culled from the Restatement of Agency, *see Reid,* 490 U.S. at 752 n. 31, 109 S.Ct. at 2179 n. 31, and from caselaw, as relevant to the inquiry:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid,* 490 U.S. at 751–52, 109 S.Ct. at 2178–79 (footnotes omitted).

■ Both parties on appeal (and the district court below) addressed themselves to the question of whether or not O'Connor was an employee within this framework. However, we think that this analysis is flawed because it ignores the antecedent question of whether O'Connor was hired by Rockland for any purpose. As the Supreme Court suggests, the common feature shared by both the employee and the independent contractor is that they are "hired part[ies]," *id.,* and thus, a prerequisite to considering whether an individual is one or the other under common-law agency principles is that the individual have been hired in the first instance. That is, only where a "hire" has occurred should the common-law agency analysis be undertaken.

■ Other courts have agreed with this view. As the Eighth Circuit has explained, courts turn to common-law principles to analyze the character of an economic relationship "only in situations that plausibly approximate an employment relationship." *Graves v. Women's Prof'l Rodeo Assoc.,* 907 F.2d 71, 74 (8th Cir.1990). Where no financial benefit

is obtained by the purported employee from the employer, no "plausible" employment relationship of any sort can be said to exist because although "compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, ... it is an essential condition to the existence of an employer-employee relationship." *Graves,* 907 F.2d at 73. *See also Neff v. Civil Air Patrol,* 916 F.Supp. 710, 712–13 (S.D.Ohio, 1996); *Smith v. Berks Community Television,* 657 F.Supp. 794, 796 (E.D.Pa.1987); *cf. Haavistola v. Community Fire Co.,* 6 F.3d 211, 219 (4th Cir.1993).

This "essential condition" of remuneration has been recognized in this Circuit as well. In *Tadros v. Coleman,* 898 F.2d 10, 11 (2d Cir.1990), we explicitly upheld the dismissal of the Title VII claims of a plaintiff who worked as a volunteer on the faculty of Cornell Medical College on the ground that the plaintiff was not an employee under Title VII. As a volunteer, the plaintiff received no salary, health benefits, retirement benefits, and also had no regular hours assigned to him by the hospital. In concluding that the plaintiff was not an employee, the district court in *Tadros* held that "[a] Title VII plaintiff is only an 'employee' if the defendant both pays him and controls his work." 717 F.Supp. 996, 1004 (S.D.N.Y.1989).

■ We believe that the preliminary question of remuneration is dispositive in this case. It is uncontested that O'Connor received from Rockland no salary or other wages, and no employee benefits such as health insurance, vacation, or sick pay, nor was she promised any such compensation.[2] This case thus differs from *Haavistola v. Community Fire Co.,* in which the Fourth Circuit considered whether a volunteer member of a fire company was an employee for Title VII purposes where "[o]n the one hand, [plaintiff] did not receive direct compensation as a member of the Fire Company, but, on the other hand, she did not affiliate with the company without reward entirely." 6 F.3d 211, 221 (4th Cir.1993). The court then noted that the plaintiff received, through her

volunteer position, a state-funded disability pension, survivors' benefits for dependents, scholarships for dependents upon death or disability, group life insurance, and several other benefits. *See id.* The court concluded that the district court granted summary judgment improvidently, given that a factfinder should determine whether "the benefits represent indirect but significant remuneration ... or inconsequential incidents of an otherwise gratuitous relationship." *Id.* at 222.

Because the absence of either direct or indirect economic remuneration or the promise thereof is undisputed in this case, we agree with the district court that O'Connor was not a Rockland employee within the meaning of Title VII and thus that her discrimination claim under that statute must fail.

## II. *Title IX*

■ O'Connor's second argument is that the district court erred in dismissing her Title IX claim in the belief that Title IX did not apply to Rockland because Rockland is not an "education program or activity." O'Connor urges that because Rockland both receives federal financial assistance either through the state, its patients, or its employees, and also operates "vocational training through an organized educational program," Appellant's Brief at 30, it is subject to Title IX's prohibition against sex discrimination— proscribed conduct that includes sexual harassment. *See Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 75, 112 S.Ct. 1028, 1037–38, 117 L.Ed.2d 208 (1992); *Kracunas,* 119 F.3d at 88–89. We disagree.

Title IX provides in pertinent part that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). Title IX has been construed to prohibit gender discrimination

---

**2.** We reject O'Connor's claim that she was compensated to the extent that she received, through Marymount, federal work study funding for the

hours of volunteer work performed at Rockland. Plainly, it was Marymount—not Rockland—that made these payments to O'Connor.

against students and employees alike in educational institutions that receive federal funding. *See Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 248 (2d Cir.1995) (citing *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520–34, 102 S.Ct. 1912, 1917–25, 72 L.Ed.2d 299 (1982)).

At issue in the present case is whether an entity such as Rockland that (1) is a state-run clinic that receives federal money,[3] and (2) permits student-interns from a college with which it has no affiliation to perform volunteer field work at its facility, is subject to Title IX on the ground that it operates an "education program or activity."

In *Grove City College v. Bell*, 465 U.S. 555, 571–75, 104 S.Ct. 1211, 1220–22, 79 L.Ed.2d 516 (1984) the Supreme Court considered the meaning of Title IX's phrase "education program or activity" and defined it narrowly, holding that by referring to particular activities or programs, Congress intended that Title IX apply only to the particular program receiving financial assistance. Thus, in *Grove City*, the Court found that the receipt by students of federal grants did not trigger institution-wide Title IX coverage, but only coverage of the school's financial aid program. *Id.* at 573–74, 104 S.Ct. at 1221–22.

In response to the Court's interpretation of Title IX, as well as out of concern that the *Grove City* definition of "program or activity" would be applied to similar language contained in § 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title VI of the Civil Rights Act of 1964, Congress passed the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, Sec. 3(a), § 908, 102 Stat. 28, 28–29 (1988) (codified at 20 U.S.C. § 1687) ("the 1988 Amendment"), which amended each of the affected statutes, including Title IX, by adding a section broadly redefining the term "program or activity." *See* S.Rep. No. 100–64, at 4 (1988) *reprinted in* 1988 U.S.C.C.A.N. 3, 6; *see also Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir.

1993). The amendment to Title IX provides in relevant part:

> For the purposes of this chapter, the term "program or activity" and "program" mean all of the operations of—
>
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B) the entity of such State or local government that distributes such assistance and each such department or agency . . . to which the assistance [to a State or local government] is extended;
>
> (2)(A) a college, university, postsecondary institution, or a public system of higher education; or
>
> (B) a local educational agency . . . , system of vocational education, or other school system. . . .
>
> any part of which is extended Federal financial assistance.

20 U.S.C. § 1687. Following the 1988 Amendment, courts have consistently interpreted Title IX to mean that if one arm of a university or state agency receives federal funds, the entire entity is subject to Title IX's proscription against sex discrimination. *See Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 271 (6th Cir.1994); *Cohen*, 991 F.2d at 894.

However, by modifying the phrase "program or activity," Congress left the modifier "education" intact, and we are bound under ordinary rules of statutory construction to give content to the entire phrase selected by Congress. *See Connecticut Dep't of Income Maintenance v. Heckler*, 471 U.S. 524, 530 n. 15, 105 S.Ct. 2210, 2213 n. 15, 85 L.Ed.2d 577 (1985). In so doing, we think it evident that in order to implicate Title IX in the first instance, an entity must have features such that one could reasonably consider its mission to be, at least in part, educational. That Congress intended this interpretation can be discerned, if vaguely, in the following

---

**3.** We note that O'Connor's complaint contains no allegation that Rockland receives any federal funding. Instead, O'Connor refers to federal funding only in her description of Marymount, a party since dropped from the case. However, because O'Connor's complaint does allege that Rockland is an agency of New York State, we will construe her complaint broadly to allege that, as a state health-care agency, Rockland receives federal money in connection with medical services provided—an inference we think equitable given that Rockland does not contest on appeal the question of federal funding.

example of the effect of the new statute, contained in the Senate Report accompanying the 1988 Amendment:

> If a private hospital corporation is extended federal assistance for its emergency rooms, the pediatrics department, admissions, discharge offices, etc., are covered under Title VI, section 504, and the Age Discrimination Act. Since Title IX is limited to education programs or activities, it would only apply to the students and employees of educational programs operated by the hospital, if any.

S.Rep. No. 100–64, at 18 (1988) *reprinted in* 1988 U.S.C.C.A.N. 3, 20. While expanding the reach of Title IX to include all departments or branches of an educational institution or program that receives federal funding, the foregoing suggests to us that the 1988 Amendment did not purport to alter the preliminary requirement that the entity funded operate an "education program."

Although the term "education" is not defined by the regulations governing Title IX and has not been construed by this court, O'Connor argues that because Rockland provides its volunteers with some modicum of on-the-job training, Rockland therefore provides vocational training, and, on that basis, may be considered to operate an organized educational program. We decline, however, to convert Rockland's willingness to accept volunteers into conduct analogous to administering an "education program" as contemplated by Title IX.

Preliminarily, in light of O'Connor's contention that Rockland's internship program is analogous to vocational training, it is instructive to look to 34 C.F.R. § 106.2, which defines for Title IX purposes the term "institution of vocational education" as:

> a school or institution (except an institution of professional or undergraduate higher education) which has as its *primary purpose* preparation of students to pursue a technical, skilled, or semiskilled occupation or trade ..., whether or not the school or institution offers certificates, diplomas, or degrees and whether or not it offers full-time study.

24 C.F.R. § 106.2(n) (emphasis supplied). Rockland plainly does not satisfy this definition, as its "primary purpose" is in no sense to educate: it accepts no tuition, has no teachers, has no evaluation process, and requires no regular hours or course of study for its volunteer workers.

Not only is Rockland's internship program not classifiable as a vocational program, Rockland also cannot be said more generally to operate an "education program" because the institution maintains none of the characteristics associated with being an educator. The environment at Rockland is not, for example, analogous to a teaching hospital's "mixed employment-training context," *see Lipsett v. University of Puerto Rico,* 864 F.2d 881, 897 (1st Cir.1988); *Henschke v. New York Hosp.-Cornell Med. Ctr.,* 821 F.Supp. 166 (S.D.N.Y.1993). Nor is Rockland's acceptance of volunteers comparable to running an educational or vocational program at a state correctional facility, *see, e.g., Jeldness v. Pearce,* 30 F.3d 1220, (9th Cir. 1994); *Women Prisoners of the Dist. of Columbia Dep't of Corrections v. District of Columbia,* 899 F.Supp. 659, 668–69 (D.D.C. 1995), as such programs typically provide instructors, evaluations, and offer a particular course of training.

Finally, the fact that Marymount operates an "education program" may not be imputed to Rockland simply because O'Connor was a student at the former while she performed volunteer work with the latter. Factors that could lead to a different conclusion simply are not present here: the two entities have no institutional affiliation; there is no written agreement binding the two entities in any way; no staff are shared; no funds are circulated between them; and, indeed, Marymount students had previously volunteered at Rockland on only a few occasions. The only hint of a connection between Marymount and Rockland lies in the fact that (1) Marymount contacted Rockland for the purpose of placing O'Connor in an internship, and (2) Marymount appears to base its evaluation of its students' performance during their internships in part on an evaluation prepared by the person who supervised the student on-site—which, in O'Connor's case, would have been Lisa Punzone of Rockland. Such connections are insufficient to establish Rock-

land as an agent or arm of Marymount for Title IX purposes. Rather, we think it clear that Rockland is a state-funded psychiatric hospital, with no affiliation to any educational institution whatsoever, that allows volunteers from a nearby college to perform (with minimal supervision) volunteer work at its facility. Rockland thus does not conduct an "education program or activity," and O'Connor's Title IX claim was properly dismissed.

## CONCLUSION

By allowing an intern to perform the fieldwork required of her by the wholly unaffiliated college she attends, Rockland is not transformed into an employer under Title VII or into an administrator of an education program or activity under Title IX. We conclude by saying only that we are not unsympathetic to O'Connor's situation. We recognize, for example, that from her perspective, her success at Marymount was dependent to some degree on successfully completing her internship with Rockland, and that her dependency on Rockland made her vulnerable to continued harassment much as an employee dependent on a regular wage can be vulnerable to ongoing misconduct. In a similar vein, we recognize that O'Connor was not in quite the same position to simply walk away from the alleged harassment as are many other volunteers. However, it is for Congress, if it should choose to do so, and not this court, to provide a remedy under either Title VII or Title IX for plaintiffs in O'Connor's position. We therefore affirm the judgment of the district court.