T.C. Memo. 2010-41

UNITED STATES TAX COURT

MILO L. AND SHARLYN K. SHELLITO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10223-06.                    Filed March 3, 2010.

<u>Frank W. Bastian</u> and <u>Reggie L. Wegner</u>, for petitioners.

<u>Peter N. Scharff</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Respondent determined deficiencies of
$3,995 and $6,947 in petitioners' 2001 and 2002 Federal income
taxes, respectively, and a $1,389 accuracy-related penalty under
section 6662(a) for 2002.[1]  The issues for decision are:

_____

[1]All Rule references are to the Tax Court Rules of Practice
(continued...)

(1) Whether petitioners are entitled for 2001 and 2002 to deduct under section 162(a) amounts they claimed for employee benefit programs on Schedules F, Profit or Loss From Farming; and (2) whether petitioners are liable for the section 6662(a) accuracy-related penalty for 2002.

FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate herein. When they petitioned the Court, petitioners resided in Kansas. During the years at issue and for an unspecified period before then, petitioners were married, with two dependent children. Hereinafter, references to petitioner are to Milo Shellito and references to Mrs. Shellito are to Sharlyn Shellito.

Petitioner has engaged in a farming business since about 1978. In 2001 and 2002 his farming operation covered about 2,300 acres. Most of this land he leased from his father or other parties. Petitioners jointly owned about 47 acres. They also jointly owned three pickup trucks that were used on the farm. Petitioner individually owned other farm equipment, including a tractor and a combine.

Petitioners held a joint checking account. They each wrote checks from the account to pay expenses. During 2001, 2002, and

---

[1](...continued)
and Procedure, and all section references are to the Internal Revenue Code in effect for the years at issue. Numbers have been rounded to the nearest dollar.

prior years a number of commercial/agricultural loans were taken out to finance petitioner's farming operations.  Both petitioners signed most of the promissory notes for the loans.

Mrs. Shellito has assisted on the farm since at least 1982. The nature of her services has remained fairly constant over time.  Before, during, and after the years at issue her services included:  Assisting with the planting and harvesting of crops; operating tractors and equipment; feeding and caring for cattle; building and repairing fencing; maintaining and performing basic equipment repairs; running various errands; and performing accounting and bookkeeping services.  Before 2001, at least, Mrs. Shellito received no compensation for these services.

In 2001, upon the advice of his banker, petitioner engaged a certified public accountant (C.P.A.) to prepare taxes and perform payroll services for the farming business.  The C.P.A. advised petitioner that he could qualify for an employee medical reimbursement plan if Mrs. Shellito were petitioner's employee. The C.P.A. created a document which petitioners signed on or about May 29, 2001.  The document states:

### EMPLOYMENT AGREEMENT

Agreement made effective as of May 29, 2001 by Milo Shellito to employee Sharlyn Shellito.  Employer is engaged in the business of farming at the following address * * *

Employer employs, engages, and hires employee as a hired hand to operate farm machinery work and handle cattle, do repairs, run errands, and another farm

related chores, and employee accepts and agrees to such hiring, engagement, and employment, subject to the orders, advice and directions of employer.

The employer has the right to terminate the employee at anytime. The employee has the right to quit at anytime.

The C.P.A. helped petitioners fill out a preprinted application for AgriPlan/BIZPLAN, a medical expense reimbursement plan, which offered medical expense reimbursements to eligible employees. Petitioner signed this application on May 29, 2001. The application lists Mrs. Shellito as the only eligible employee of petitioner. It indicates that available benefits for Mrs. Shellito were to consist of unlimited reimbursement of health insurance premiums for her and her family, reimbursement of up to $15,000 of out-of-pocket medical expenses for her and her family, and $50,000 of term life insurance for Mrs. Shellito.[2]

Also on May 29, 2001, an individual checking account was opened in Mrs. Shellito's name. Acting on the C.P.A.'s advice, on June 7, 2001, and each month thereafter in 2001 and 2002, petitioner wrote Mrs. Shellito a $100 check from their joint checking account, which she deposited into her individual checking account. The memo line on most of the checks and each accompanying deposit ticket stated that the check represented wages or salary. Mrs. Shellito used these funds to pay for

---

[2]There is no indication in the record that petitioner ever provided Mrs. Shellito any term life insurance.

medical care for herself, petitioner, and their dependent children.

2001 Items and Tax Treatment

For the part of 2001 after May 29, 2001, Mrs. Shellito paid $7,899 in expenses for medical care and health insurance premiums for herself, petitioner, and their dependent children, as follows:

| Expense/Premium | Amount |
|---|---|
| Out-of-pocket medical expenses[1] | $4,671 |
| Medical mileage | 97 |
| Insurance premiums[2] | 3,131 |
| Total | 7,899 |

[1]This amount includes $4,479 that Mrs. Shellito paid from her separate checking account and $192 that she paid directly from petitioners' joint checking account.

[2]This $3,131 of insurance premiums comprised these three items: (1) $689 that Mrs. Shellito paid to Conesco Health Insurance Co. for an insurance policy under which she was the primary insured; (2) $1,990 that Mrs. Shellito paid to American Republic Insurance Co. for an insurance policy under which petitioner was the primary insured; and (3) $452 that was automatically debited from petitioners' joint checking account for premiums paid to American Fidelity Insurance Co. for a cancer expense insurance policy that listed petitioner as the named insured.

Beginning July 18, 2001, and continuing periodically thereafter throughout 2001, petitioner wrote Mrs. Shellito checks totaling $5,400, drawn on their joint checking account. She deposited them in her separate checking account. The

accompanying deposit tickets indicate that the deposits represented medical reimbursements from Mr. Shellito.[3]

On January 11, 2002, petitioners executed a document entitled "Employee Benefit Expense Transmittal", which they sent to AgriPlan/BIZPLAN. In this document petitioner claimed eligible expenses incurred for eligible plan participants during 2001 of $10,323.[4] On February 20, 2002, AgriPlan/BIZPLAN sent a yearend report to petitioner. The report indicated that on the basis of a review of the Employee Benefit Expense Transmittal, the total submitted benefit expenses were $15,593 and that this amount could be deducted as a business expense on petitioner's business tax return.[5]

---

[3]Petitioners allege that petitioner actually paid Mrs. Shellito more than the $5,400 of reimbursements described above because he paid additional amounts directly to insurance companies on Mrs. Shellito's behalf. Although we do not find petitioners' allegations well founded, because our analysis does not depend upon the exact amount of reimbursements that petitioner allegedly paid Mrs. Shellito, we need not address this issue further.

[4]We are unable to correlate this number with other evidence in the record.

[5]The record does not conclusively explain the discrepancy between the $15,593 listed on this yearend report and the $10,323 of expenses that petitioner claimed on the Employee Benefit Expense Transmittal or the $7,899 of medical expenses that Mrs. Shellito incurred after May 29, 2001.

Petitioner issued to Mrs. Shellito a Form W-2, Wage and Tax Statement, reporting wages paid of $754 in 2001.[6]  Petitioners reported this amount as wages on their 2001 Form 1040, U.S. Individual Income Tax Return, which their C.P.A. prepared.  On the Schedule F attached to their 2001 Form 1040, petitioners claimed a $15,593 deduction for "Employee benefit programs" and a $700 deduction for "Labor hired".  On their 2001 Form 1040 petitioners listed Mrs. Shellito's occupation as "HOUSE WIFE".

In the notice of deficiency respondent disallowed $14,904 of the amount that petitioners had claimed for "Employee benefit programs"; i.e., all but $689.[7]  Respondent allowed petitioners a $2,898 offsetting adjustment for "Self Employed Health Insurance".[8]

2002 Items and Tax Treatment

For 2002 Mrs. Shellito incurred or paid $22,307 of expenses for medical care and health insurance premiums for herself, petitioner, and their dependent children, as follows:

---

[6]This amount represents $700 of total monthly cash payments plus $54 of employment taxes that petitioner reported paying on Mrs. Shellito's behalf.  On Form 943, Employer's Annual Tax Return for Agricultural Employees, petitioner reported liability for employment taxes of $107 for 2001.

[7]The parties agree that this $689 represents the premium that Mrs. Shellito paid in 2001 on the Conesco Health Insurance Co. insurance policy that listed her as the primary insured.

[8]The record does not indicate how this adjustment was calculated.

| Expense/Premium | Amount |
|---|---|
| Out-of-pocket medical expenses | $15,975 |
| Medical mileage | 435 |
| Insurance premiums[1] | 5,897 |
| Total | 22,307 |

[1]This $5,897 of insurance premiums comprised these two items: (1) $1,702 that Mrs. Shellito paid to Conesco Health Insurance Co. for the insurance policy under which she was the primary insured; and (2) $4,195 that Mrs. Shellito paid to American Republic Insurance Co. for an insurance policy that listed petitioner as the primary insured.

During 2002 petitioner wrote Mrs. Shellito, on their joint checking account, checks totaling $20,800, which she deposited in her separate checking account. The accompanying deposit tickets indicate that the deposits represented medical reimbursements from petitioner.

On January 30, 2003, petitioners executed a document entitled "Employee Benefit Expense Transmittal", which they sent to AgriPlan/BIZPLAN. In this document petitioner claimed expenses for eligible plan participants during 2002 of $22,202, consisting of $5,897 insurance premiums and $16,305 of medical expenses.[9] On February 14, 2003, AgriPlan/BIZPLAN sent a yearend report to petitioner. The report indicated that on the basis of a review of the Employee Benefit Expense Transmittal, the total submitted benefit expenses were $22,202 and that after a $1,305

[9]Although $22,202 is close to the $22,307 of medical expenses incurred or paid by Mrs. Shellito during 2002, the record does not explain the seeming discrepancy.

negative adjustment, the total benefit expenses that could be claimed as a business expense on petitioner's business tax return were $20,897.[10]

Petitioner issued to Mrs. Shellito a Form W-2 reporting wages paid of $1,292 in 2002.[11] Petitioners reported this amount as wages on their 2002 Form 1040, which their C.P.A. prepared. On the Schedule F attached to their 2002 Form 1040, petitioners claimed a $20,897 deduction for "Employee benefit programs" and a $1,200 deduction for "Labor hired". On their 2002 Form 1040 petitioners listed Mrs. Shellito's occupation as "HOUSE WIFE".

In the notice of deficiency respondent disallowed $20,208 of the amount that petitioners had claimed for "Employee benefit programs"; i.e., as for 2001, all but $689.[12] Respondent allowed

_____

[10]The report contains no explanation of the $1,305 negative adjustment. It appears, however, that this was the amount by which petitioner's $16,305 of reported medical expenses exceeded the $15,000 limit on reimbursements of out-of-pocket expenses as indicated on petitioner's AgriPlan/BIZPLAN application.

[11]This amount represents $1,200 of total monthly cash payments plus $92 of employment taxes that petitioner reported paying on Mrs. Shellito's behalf for 2002. On Form 943 petitioner reported liability for employment taxes of $184 for 2002.

[12]As noted supra note 7, the parties agree that $689 represents the premium that Mrs. Shellito paid in 2001 on the Conesco Health Insurance Co. insurance policy under which she was the primary insured. In 2002 the premium that Mrs. Shellito paid on this insurance policy was actually $1,702. The record contains no explanation as to why respondent allowed this deduction for 2002 in the amount of the 2001 premium.

petitioners a $3,646 offsetting adjustment for "Self Employed Health Insurance".[13]

## OPINION

### I.   Employee Benefit Plan Expenses

Before 2001 Mrs. Shellito had worked on petitioners' family farm without compensation for about 20 years.  In 2001, upon the advice of their C.P.A., petitioners signed a document whereby Mrs. Shellito purportedly became her husband's at-will employee. Although the document makes no reference to compensation, petitioner purportedly agreed to pay Mrs. Shellito $100 a month plus medical benefits in the form of reimbursements for medical expenses and health insurance premiums incurred for herself, petitioner, and their dependent children.  Petitioners contend that pursuant to section 162(a) they are entitled to deduct these purported reimbursements as employee benefit plan expenses.  For the reasons explained below, we disagree.

### A.   Burden of Proof

As a general matter, the Commissioner's determination is presumptively correct, and the taxpayer bears the burden of proving entitlement to claimed deductions.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  In certain circumstances, the burden of proof with respect to any factual

---

[13]The record does not indicate how this adjustment was calculated.

issue may be shifted to the Commissioner.  Sec. 7491(a).  The parties disagree as to whether petitioners have met the statutory requirements to shift the burden of proof to respondent.  Because we do not decide this case by reference to the placement of the burden of proof, we need not and do not decide whether petitioners have met the requirements under section 7491(a) to shift the burden of proof to respondent.

B.  Section 162(a)

Section 162(a)(1) allows a deduction for all ordinary and necessary expenses paid or incurred in carrying on any trade or business, including a reasonable allowance for "salaries or other compensation for personal services actually rendered", such as any amount paid to an employee pursuant to an employee benefit plan for an expense that the employee pays or incurs.  Sec. 1.162-10(a), Income Tax Regs.; see Frahm v. Commissioner, T.C. Memo. 2007-351.[14]  Respondent concedes that pursuant to this

_____

[14]Under sec. 105(b), accident and health insurance payments made directly or indirectly to an employee to reimburse expenses for medical care are, with certain limitations, excludable from the employee's gross income.  For this purpose, amounts received under an "accident or health plan for employees" are treated as amounts received through accident or health insurance.  Sec. 105(e).  Ostensibly pursuant to this provision, petitioners have excluded from Mrs. Shellito's gross income the medical expense reimbursements that petitioner allegedly paid to her.  This claimed exclusion, which is not at issue in this case, is inconsequential in the light of our holding that Mrs. Shellito was not petitioner's employee and received no compensation from him.

(continued...)

provision petitioners are entitled to most of the claimed deductions for "Employee benefit programs" if Mrs. Shellito is properly considered her husband's employee.[15]  Respondent contends, however, that petitioners are not entitled to these deductions because Mrs. Shellito was not a bona fide employee of her husband.  We agree with respondent.

C.  Analysis

Citing Matthews v. Commissioner, 92 T.C. 351, 361 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990), and like cases, petitioners contend that under the common law agency test, the crucial consideration is the right of control, or lack of it, which the employer may exercise over the putative employee.  Petitioners assert that petitioner has employed Mrs. Shellito since 1982

---

[14](...continued)
Pursuant to sec. 162(l)(1), a self-employed individual may deduct a percentage (60 percent in 2001, 70 percent in 2002) of any amount paid or incurred for insurance that constitutes medical care for the taxpayer or the taxpayer's spouse or children.  In the notice of deficiency respondent allowed petitioners adjustments for "Self Employed Health Insurance" for each year at issue, ostensibly pursuant to sec. 162(l)(1).  Although we are unable to correlate the derivation of the amounts of these adjustments with the evidence of record, the parties have not raised and accordingly we do not reach any issue regarding these adjustments.

[15]Respondent contends that even if Mrs. Shellito were deemed petitioner's employee, petitioners are not entitled to deduct certain relatively small amounts that respondent alleges were paid before May 29, 2001, or amounts that respondent contends exceed petitioner's actual reimbursements to Mrs. Shellito.  In the light of our holding that Mrs. Shellito was not a bona fide employee of petitioner, it is unnecessary to address these contentions.

because since then she has performed her services on the family farm under petitioner's control and instruction. They contend that petitioners entered into an employment agreement on May 29, 2001, to "formalize" this preexisting employer-employee relationship.

We do not agree that the purported employment agreement formalized a preexisting employer-employee relationship because we do not believe there was any such preexisting relationship. The existence of remuneration is an "'essential condition'" of an employer-employee relationship. O'Connor v. Davis, 126 F.3d 112, 116 (2d Cir. 1997) (quoting Graves v. Women's Profl. Rodeo Association, Inc., 907 F.2d 71, 73 (8th Cir. 1990)); see McGuinness v. Univ. of N.M. Sch. of Med., 170 F.3d 974, 979 (10th Cir. 1998). Absent remuneration, there is no "plausible" employment relationship and consequently no need to undertake a common law agency analysis. Graves v. Women's Profl. Rodeo Association, Inc., supra at 73-74.

According to petitioners' own testimony, before May 29, 2001, Mrs. Shellito received no remuneration for her services.[16] Consequently, because this essential condition of an employment relationship was missing, Mrs. Shellito was not her husband's

---

[16]Mrs. Shellito testified that petitioner did not pay her or provide her any form of compensation before May 29, 2001. Similarly, petitioner testified that he started paying Mrs. Shellito and providing her "medical insurance" in 2001.

employee before 2001, irrespective of the degree of control he might have exercised over her.  Rather, it appears to us that during these many years Mrs. Shellito rendered her services as part of the "'shared enterprise'" of marriage, Cray v. Cray, 867 P.2d 291, 299 (Kan. 1994) (quoting Berish v. Berish, 432 N.E.2d 183, 184 (Ohio 1982)), as petitioners worked together to make a living and raise their family.

We are not convinced that anything happened in 2001 that materially changed the nature of petitioners' economic relationship.  Mrs. Shellito's tasks on the farm were unchanged. More significantly, Mrs. Shellito's purported "compensation" was, we believe, illusory.

In essence, the purported compensation arrangement was that petitioner would reimburse Mrs. Shellito for family medical expenses and insurance premiums that she paid.[17]  In paying these expenses from her separate checking account, Mrs. Shellito ostensibly assumed the obligation to pay family medical expenses that under Kansas law were as much her husband's liability as her own.  See St. Francis Regl. Med. Ctr., Inc. v. Bowles, 836 P.2d

---

[17]Although petitioner "paid" Mrs. Shellito (from their joint checking account) $100 "wages" each month in addition to reimbursements for medical expenses, he testified that he reimbursed her for the amount of "medical bills and stuff" that was "above and beyond the $100 that I'd paid her prior to."  In essence, then, the $100 per month of "wages" appears to have been simply a component of the medical expense reimbursements that petitioner allegedly paid Mrs. Shellito.

1123, 1125 (Kan. 1992) (pursuant to the common law "doctrine of necessaries", as recognized under Kansas law based upon the concept of "unity of marriage", each spouse is liable for the other's "necessaries", including "medical services"). We do not see that Mrs. Shellito obtained any economic benefit from her husband's "reimbursing" her, from their joint checking account, for medical expenses for which he was also liable.[18]

In the absence of proof to the contrary, petitioners are presumed to own equally the funds in their joint checking account. See Walnut Valley State Bank v. Stovall, 574 P.2d 1382 (Kan. 1978). Consequently, we consider the funds paid from their joint checking account to have been paid equally by each of them. Cf. Higgins v. Commissioner, 16 T.C. 140 (1951) (husband was entitled to deduct on his separate return only half of the interest paid from his and his wife's joint checking account). Insofar as Mrs. Shellito was "reimbursed" with her own funds from the joint checking account, she clearly obtained no economic benefit. Insofar as she was "reimbursed" with her husband's funds from the joint checking account, any resulting economic

---

[18]Relatively small amounts of the medical expenses in question were automatically debited from petitioners' joint checking account. In addition, Mrs. Shellito paid small amounts of the medical expenses in question from petitioners' joint checking account. These circumstances do not affect our conclusion that Mrs. Shellito obtained no economic benefit from the purported employment agreement.

benefit is directly offset and negated by her assuming and paying her husband's liability for the family medical expenses.

When all is said and done, it appears to us that Mrs. Shellito's and her family's medical expenses and health insurance premiums continued, in effect, to be paid from petitioners' joint checking account just as they always had been. We conclude that Mrs. Shellito received no remuneration under the purported employment arrangement and consequently during the years at issue, as in the preceding years, there was no bona fide employment relationship.

Petitioners executed the purported employment agreement for tax reasons on the advice of their C.P.A., who had prepared the document for them. Petitioner testified forthrightly that he started paying Mrs. Shellito in June of 2001 because "it would be a tax break that I could use." Citing Seidel v. Commissioner, T.C. Memo. 1971-238, petitioners contend that the mere fact that petitioner had a tax-savings motive does not affect the validity of the purported employee benefit plan that he adopted. This may be true but is beside the point--even a valid employee benefit plan is unavailing in the absence of a bona fide employment relationship. Although a "tax-avoidance motive for structuring a transaction in a particular way is not inherently fatal," a transaction between family members deserves a heightened level of "skepticism and scrutiny" to determine the transaction's

substance. <u>True v. United States</u>, 190 F.3d 1165, 1174 n.6 (10th Cir. 1999); see <u>Hamdi v. Commissioner</u>, T.C. Memo. 1993-38, affd. without published opinion 23 F.3d 407 (6th Cir. 1994). Exercising that heightened skepticism and scrutiny, we conclude that in substance petitioners' purported employment agreement was a mere formalism that, for the reasons previously discussed, did not give rise to a true employment relationship.[19]

In support of their argument that Mrs. Shellito was petitioner's bona fide employee, petitioners note that in the notice of deficiency respondent did not disallow the deduction petitioners claimed on Schedule F for "wages" that petitioner paid Mrs. Shellito and also allowed for each year at issue $681 of the expenses that petitioners claimed for employee benefit programs. The notice of deficiency does not explain the treatment of these items, and respondent has offered no explanation in this proceeding.[20] Whatever inferences might be

---

[19]This conclusion is not altered by the fact that petitioner reported Mrs. Shellito's "wages" on Forms W-2 and paid relatively small amounts of employment taxes in furtherance of the claimed deductions for employee benefit programs, the economic benefit of which, if sustained, would far exceed the relatively small amount of employment taxes incurred.

[20]It might be inferred that respondent's allowing the deduction for "wages" paid might have been meant to counterbalance petitioners' including these amounts in gross income as wages. Cf. <u>Haeder v. Commissioner</u>, T.C. Memo. 2001-7 n.10 (noting that the Commissioner had determined that the taxpayers' income should be reduced by wages the husband allegedly paid to his wife). The allowance of the $689 deduction
(continued...)

drawn from respondent's treatment of these items are counterbalanced, however, by inferences that might be drawn from petitioners' describing, on their Forms 1040 for each year at issue, Mrs. Shellito's occupation as "HOUSE WIFE"--a characterization that we believe was accurate.

In sum, we conclude that because she received no remuneration and the purported employment agreement was a mere formalism, Mrs. Shellito was not petitioner's bona fide employee for the years at issue.[21] Consequently, petitioner is not

_____

[20](...continued)
for employee benefit programs for both 2001 and 2002 is more puzzling.  The parties agree that this $689 deduction represents the premium that Mrs. Shellito paid in 2001 on her Conesco Health Insurance Co. policy.  In 2002, however, her premium on this policy was $1,702.

[21]Cf. Frahm v. Commissioner, T.C. Memo. 2007-351 (holding that employee benefit plan expenses were allowable under sec. 162(a); the Commissioner conceded the existence of a valid employment relationship between the married taxpayers); Eyler v. Commissioner, T.C. Memo. 2007-350 (disallowing claimed sec. 162(a) deduction for want of proof that the taxpayer husband paid health insurance premiums in his capacity as his wife's employer pursuant to an unwritten health plan rather than in his individual capacity as the primary insured under the health policy); Albers v. Commissioner, T.C. Memo. 2007-144 (disallowing claimed sec. 162(a) deduction because taxpayers failed to prove that the employer husband paid his employee wife, pursuant to an employee benefit plan, amounts to reimburse her for medical expenses that she incurred or paid); Francis v. Commissioner, T.C. Memo. 2007-33 (without deciding the bona fides of a purported employment relationship between the married taxpayers, disallowing disputed amounts of sec. 162(a) deduction for want of evidence that any compensation the taxpayer husband paid his wife was reasonable in amount); Haeder v. Commissioner, supra, (disallowing claimed sec. 162(a) deduction on the basis that the taxpayer's wife was not his bona fide employee because she
(continued...)

entitled under section 162(a) to any deduction for employee program benefits in excess of the amounts respondent has allowed.

## II. Accuracy-Related Penalty

Respondent determined that for 2002 petitioners are liable for an accuracy-related penalty under section 6662(a).  Section 6662(a) and (b)(2) imposes a 20-percent accuracy-related penalty on any portion of a tax underpayment that is attributable to, among other things, any substantial understatement of income tax, defined in section 6662(d)(1)(A) as an understatement that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1).

The accuracy-related penalty does not apply with respect to any portion of the underpayment if it is shown that the taxpayer had reasonable cause and acted in good faith.  Sec. 6664(c)(1).  Such a determination is made by taking into account all facts and circumstances, including the experience and knowledge of the taxpayer and his or her reliance on a professional tax adviser.  See sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners sought and in good faith, we believe, followed the tax advice of their C.P.A., who steered them into setting up the medical reimbursement plan, helped them fill out the application for it, drafted the purported employment agreement

[21](...continued)
performed no services "other than those reasonably expected of a family member").

for them, and prepared their tax returns for the years at issue. Taking into account all the facts and circumstances, including petitioners' lack of experience and knowledge regarding tax matters, we conclude that they reasonably relied upon the C.P.A.'s advice in claiming the disputed deductions. Cf. <u>United States v. Boyle</u>, 469 U.S. 241, 251 (1985) ("When an accountant or attorney <u>advises</u> a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice."). We do not sustain imposition of the accuracy-related penalty.

To reflect the foregoing,

<u>An appropriate decision</u>

<u>will be entered</u>.