ZATKOFF, District Judge,
dissenting in part.
I agree with the majority in regard to affirming summary judgment for PRS and BJC. With respect to EnergySolutions, however, I disagree that Vander Boegh has created a genuine issue of fact regarding Kelly’s knowledge of the protected activity. I also question whether Vander Boegh has statutory standing to bring his ERA claims against EnergySolutions in the first place. Accordingly, I respectfully dissent.
I. Kelly’s Knowledge
“The decisionmaker’s knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation.” Frazier v. USF Holland, Inc., 250 Fed.Appx. 142, 148 (6th Cir.2007) (citing Mulhall v. Ashcroft, 287 F.8d 543, 551 (6th Cir.2002)). While in most cases “the plaintiff will be able to produce direct evidence that the decision making officials knew of the plaintiffs protected activities,” the lack of such direct evidence is not necessarily fatal if circumstantial evidence can establish this element of the claim. Mulhall, 287 F.3d at 552-53.
Kelly testified that he was not aware of Vander Boegh’s protected activities before making the decision to hire Corpstein, and that he did not become aware of the protected activities until mid-to-late March or early April, 2006. Although this denial may be rebutted with countervailing evidence, see Lippert v. Cmty. Bank, Inc., 438 F.3d 1275, 1282 (11th Cir.2006), such evidence must amount to more than just “conspiratorial theories ... or ‘flights of fancy, speculations, hunches, intuitions, or rumors.’ ” Mulhall, 287 F.3d at 552 (quoting Visser v. Packer Eng’g Assocs., Inc., 924 F.2d 655, 659 (7th Cir.1991) (en banc)). See also Menne v. Celotex Corp., 861 F.2d 1453, 1463 (10th Cir.1988) (finding that the inference drawn from the evidence “must not be based on conjecture, speculation, or mere possibility”); Lisa-Jet, Inc. v. Duncan Aviation, Inc., 569 F.2d 1044 (8th Cir.1978) (same); Lohrmann v. Pittsburgh Coming Corp., 782 F.2d 1156, 1163 (4th Cir.1986) (“permissible inferences must ... be within the range of reasonable probability”) (citation omitted).
*534 The evidence offered by Vander Boegh and cited by the majority is: (1) that Van-der Boegh filed complaints with DOE on February 21, 2006, and February 24, 2006, and that both complaints were viewable on DOE’s website; (2) that Kelly was responsible for overseeing the transition of landfill operations and managing “due diligence” during the transition period; (3) that on February 13, 2006, Vander Boegh spoke with Corpstein and commented about the leachate storage problems at the PGDP; and (4) that despite his due diligence responsibility, Kelly decided to hire Corpstein without interviewing Vander Boegh, who had over a decade of experience as a certified landfill manager. Although this evidence may create a factual issue as to whether Kelly could have discovered the protected activity before deciding to hire Corpstein, I do not find that it creates a factual issue as to whether Kelly did have such knowledge. Rather, inferring Kelly’s knowledge of the protected activity requires “conspiratorial theory,” conjecture and speculation. E.g., Mulhall, 287 F.3d at 552; Menne, 861 F.2d at 1463.
First, there is no evidence from which to infer that Kelly must have checked the DOE website before deciding to hire Corp-stein. Vander Boegh made his first complaint on February 21, 2006. According to Kelly’s testimony, he was a very busy man during the transition, often working 15 hours a day. He also testified that only 10-20% of his time was devoted to Landfill matters. Even assuming that Kelly offered Corpstein the job on March 9, 2006, there is no evidence nor is it inferable that after February 21 — but before March 9— Kelly checked the DOE website, especially given his busy schedule and numerous responsibilities at the time. Indeed, the evidence is entirely consistent with Kelly checking the DOE’s website after having decided to hire Corpstein (e.g., on March 10).
Second, the evidence that Corpstein had knowledge of the protected activity is tenuous. Vander Boegh claims that at the February 13, 2006, meeting, he asked Corpstein about EnergySolutions’ free liquid problems and “commented about the leachate storage issues at the landfill.” (R.48-2 at 18-19; Pg ID at 801-02.) On its face, this , comment does not allude to a particular protected activity by Vander Boegh, but instead appears to have been a vague reference to the conditions at the landfill. Even assuming that Corpstein was present at the meeting — which remains in question — and that Vander Boegh made the comment, it does not necessarily follow that Corpstein translated the comment into knowledge of Vander Boegh’s protected activity.
Third, the fact that Kelly hired Corp-stein without having interviewed Vander Boegh neither indicates foul play nor gives rise to an inference that Kelly had knowledge of the protected activity, especially when considering the context in which Kelly made the decision. Kelly testified that:
After working with Mr. Corpstein on a daily basis and becoming familiar with his experience and credentials, 'which included landfill management and waste disposal, and based on my favorable impressions of Mr. Corpstein’s skills and work ethic, I made the decision to hire Mr. Corpstein ... as the Landfill Manager.... I consulted with my manager at the time[,] ... Pat Hopper, on this decision prior to finalizing the action. Mr. Hopper endorsed my decision and agreed that Mr. Corpstein was well qualified for the position of Landfill Manager.
(R. 4(M at 13-15; Pg ID at 343-45) (emphasis added). Kelly’s high regard for Corpstein is also corroborated by Hopper’s *535 testimony. The testimony confirmed that Kelly communicated to Hopper the decision to hire Corpstein and that Hopper endorsed the decision on account of Corp-stein’s credentials and experience. Hopper also noted that there was nothing unusual about Kelly, the most senior Duratek employee, hiring Corpstein, another longtime Duratek employee who contributed in the transition. In fact, Hopper noted that whenever EnergySolutions transitioned into a new site and replaced an existing contractor, it brought its own management team to replace the previous contractor’s managers, and that this is a common practice in the industry. The testimony of Hopper and Kelly regarding Corpstein’s hiring was not rebutted by Plaintiff.
For his part, Vander Boegh finds it peculiar that he did not receive an interview despite having ten years of experience and — unlike Corpstein — the proper licen-sure for the position. This is insignificant. Corpstein was by no means a novice employee. He had worked for Duratek/Ener-gySolutions for more than 20 years and was a Senior Project Manager before transferring to the Landfill to aid in the transition. Also, as attested to by Kelly and Hopper, Corpstein further proved his worth during the long hours he spent working closely with and reporting to Kelly during the transition. As to the licen-sure, it appears to have been little more than a paperwork formality having no bearing on Corpstein’s ability to perform the duties of Landfill Manager. In fact, the licensure appears to have been so insignificant that the KDWM allowed Corp-stein to perform all the duties of Landfill Manager without him having participated in the training class or received his certification — albeit while having the title of “interim” Landfill Manager until such time as he could complete the class. The class, however, took all of three days and, exactly one week after completing it, Corpstein received his full certification.
In sum, viewing the circumstantial evidence as a whole does not give rise to a reasonable inference that Kelly had knowledge of the protected activity. Van-der Boegh presented no evidence that Kelly checked the DOE website and learned of the complaints, or that Kelly did so during the approximately 2 week window between the first complaint and the hiring of Corpstein. Rather, the evidence is such that Kelly had the opportunity to learn of the protected activity — if he had checked the DOE website between February 21 and March 9. Nor has Van-der Boegh produced sufficient evidence that Corpstein had knowledge of the protected activity and shared it with Kelly, or that Kelly declined to interview Vander Boegh based on such knowledge. Again, there is no evidence that Kelly learned of the protected activity, and there is countervailing evidence showing that Kelly declined to interview Vander Boegh for permissible reasons. Finally, knowledge may not be imputed to Kelly based on Vander Boegh’s claim that Corpstein knew of the protected activity and had influence over Kelly’s decision-making. This “cat’s paw” theory applies in the context of discrimination cases to impute discriminatory animus from an employee to a decision-maker, not in retaliation cases to impute the knowledge a protected activity from an employee to a decision-maker. See Arendale v. City of Memphis, 519 F.3d 587 (6th Cir.2008) (imputing discriminatory bias); Roberts v. Principi, 283 Fed.Appx. 325, 333 (6th Cir.2008) (“In the employment discrimination context, ‘cat’s paw’ refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.”) (citations omitted). Accordingly, I would af *536 firm the district court’s summary judgment in favor of EnergySolutions.
II. VandeR Boegh’s Employment Status
Additionally, I am troubled by the fact that Vander Boegh’s only connection to EnergySolutions was his employment with the company that EnergySolutions supplanted. Although EnergySolutions only raises this issue in passing, it leads me to question whether Vander Boegh has statutory standing to bring his ERA claims.
Under the ERA, “[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee ” engaged in an activity protected by the statute. McNeill v. U.S. Dep’t of Labor, 243 Fed.Appx. 93, 97 (6th Cir.2007) (internal quotation marks omitted) (citing 42 U.S.C. § 5851(a)(1)) (emphasis added). It is “a remedial statute intended to shield employees from adverse action taken by their employers in response to employees’ complaints of safety violations.” Connecticut Light & Power Co. v. Sec’y of U.S. Dep’t of Labor, 85 F.3d 89, 93 (2d Cir.1996) (emphasis added). See also Hasan v. U.S. Dep’t of Labor, 298 F.3d 914, 916 (10th Cir.2002).
Although the ERA lists examples of entities that qualify as “employers,” the statute does not define the term “employee.” See 42 U.S.C. § 5851. Nor do the relevant regulations define the term. See 29 C.F.R. § 24.1-24.5. Where Congress uses the term “employee” without precisely defining it, courts should presume that Congress had in mind “the conventional master-servant relationship as understood by the common-law agency doctrine.” Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739-40, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)) (holding that “In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party’s right to control the manner and means by which the product is accomplished^]” and listing several factors relevant to this inquiry). Under Darden, a complainant bringing an ERA retaliation claim must be a “hired party.” Demski v. U.S. Dep’t of Labor, 419 F.3d 488, 492 (6th Cir.2005) (citations omitted). See also O’Connor v. Davis, 126 F.3d 112, 115 (2d Cir.1997).
In this case, the parties agree that Van-der Boegh was never hired by EnergySo-lutions. In fact, Vander Boegh brought suit because he was never hired. Nor was Vander Boegh ever employed, managed, or supervised by EnergySolutions, and no contractual relationship otherwise existed between them. Rather, Vander Boegh’s asserted right to the position is based on his claim that PRS’s contract contained a provision granting “grandfathered employees” a hiring preference for vacancies. But, as the majority points out, Vander Boegh presents no evidence that he was a grandfathered employee under the new contract. Only “non-managerial” employees are considered “grandfathered” under the contract, and the landfill manager position is specifically denoted as “managerial.”
Additionally, it is undisputed that Van-der Boegh received no salary or wages from EnergySolutions. “Where no financial benefit is obtained by the purported employee from the employer, no ‘plausible’ employment relationship of any sort can be said to exist because although ‘compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, ... it is an essential condition to the existence of an employer-employee relationship.’ ” O’Con *537 nor, 126 F.3d at 115-16 (citing Graves v. Women’s Prof'l Rodeo Assoc., 907 F.2d 71, 74 (8th Cir.1990)).
Therefore, I believe that EnergySolu-tions never “hired” Vander Boegh in “any sense that we understand the term.” Demski, 419 F.3d at 492 (finding that the complainant, who was the owner and sole shareholder of company that provided contract labor at DOE plant, was not an “employee” for purposes of ERA).
III. ConclusioN
Because I find that there is insufficient evidence from which a jury could reasonably find that Kelly had knowledge of Van-der Boegh’s protected activity and because I do not believe that Vander Boegh qualifies as an employee for purposes of ERA, I respectfully dissent.