**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0452n.06
Filed: June 27, 2007

No. 05-4190

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MICHAEL McNEILL, | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW |
| | ) | OF AN ORDER OF THE |
| UNITED STATES DEPARTMENT | ) | ADMINISTRATIVE REVIEW |
| OF LABOR, | ) | BOARD |
| | ) | |
| **Respondent,** | ) | |
| | ) | **O P I N I O N** |
| CRANE NUCLEAR, INC.; LIBERTY | ) | |
| TECHNOLOGIES, INC., | ) | |
| | ) | |
| **Intervenors.** | ) | |
| | ) | |

**Before: MOORE and GRIFFIN, Circuit Judges; McKINLEY,[*] District Judge.**

**KAREN NELSON MOORE, Circuit Judge.** Petitioner Michael McNeill ("McNeill")
petitions for review of the Administrative Review Board's ("ARB") Final Decision and Order and
its Order Denying Reconsideration both of which denied McNeill's complaint filed pursuant to the
Energy Reorganization Act ("ERA"), 42 U.S.C. § 5851.[1] McNeill's complaint alleged that his

---

[*]The Honorable Joseph H. McKinley, Jr., United States District Judge for the Western
District of Kentucky, sitting by designation.

[1]The Secretary of Labor has delegated authority to the Administrative Review Board to
review an ALJ's decision in cases arising under the ERA. 29 C.F.R. § 24.8(a) (2006). Accordingly,
we review the ARB decision as the decision of the Secretary of Labor.

employer, Crane Nuclear, Inc. ("Crane"), violated the whistleblower provision of the ERA by retaliating against him for engaging in activity protected by the statute. Because the ARB's determination that McNeill was not terminated is supported by substantial evidence, we **DENY** McNeill's petition for review.

## I. BACKGROUND

In February 1999, McNeill worked as a pump mechanic for Crane at the D.C. Cook nuclear power station ("Cook") in Bridgman, Michigan. Crane was operating under a contract with the power-station owner, American Electric Power ("AEP").[2] Crane's employees performed assignments pursuant to written work instructions ("work packages"), and employees had the right to refuse to perform an assignment if they reasonably believed that the work package was incomplete.

On February 10, 1999, McNeill and his co-worker, Paul Pappalardo ("Pappalardo"), refused to perform an assignment, believing the work package was deficient. When Pappalardo informed Crane supervisor Woody Hall ("Hall") that he and McNeill would not work the assignment as written, Hall said, "Paul, if you don't want to do the job, go home. I don't need you here." Joint Appendix ("J.A.") at 471 (Pappalardo Dep. at 30). A few months earlier, Hall had sent the pump crew home, including McNeill and Pappalardo, because the crew had become angry and Hall thought they were too upset to work safely. At that time, McNeill did not interpret Hall as firing McNeill.

_____

[2]As the ARB explained in its Final Decision and Order, "In 1997, Liberty Technologies, Inc., (Liberty) contracted with AEP to repair pumps. Liberty hired McNeill in 1998 to work on the pump crew at D.C. Cook. Crane later purchased Liberty, made Liberty a division of Crane, and took over Liberty's contract with AEP." J.A. at 123 (Final Decision and Order at 2 n.2). Because "Crane retained Liberty's pump crew at D.C. Cook, and Crane managers assumed management responsibility for them," *id*., the ARB referred to the two companies interchangeably as "Crane." We do the same here.

However, this time, when Pappalardo relayed Hall's words to McNeill, both men interpreted Hall's words to mean they were fired.

McNeill and Pappalardo went to the on-site Nuclear Regulatory Commission inspector to complain that they had been fired for exercising their right to refuse to work with a deficient work package. Hall reported the incident to AEP's maintenance supervisor, John Boesch ("Boesch"). Boesch, in turn, contacted Marcus Boggs ("Boggs"), the Crane manager responsible for the AEP contract, to explain the situation.

At some point between 11:00 a.m. to 11:30 a.m., AEP suspended Hall, Pappalardo, and McNeill's unescorted access to the restricted area. McNeill needed unescorted access at Cook in order to perform his job.

At around 12:45 p.m., Boggs, who was in Seattle at the time, talked to McNeill on the telephone, and told McNeill that he was not fired, and that he was still on Crane's payroll. Boggs also told McNeill that he would come to Michigan the next day to find out what happened.

The next day, Thursday, February, 11, Boggs was back in Michigan. He contacted McNeill and reiterated that McNeill was not fired, that Hall did not have the authority to fire him, and that McNeill's clearance would be reactivated.

On February 15, Boggs replaced Hall with a new project coordinator, Larry Ricks ("Ricks"). Boggs also organized a meeting with all Crane employees at Cook so that they understood their right to make safety complaints and to highlight Crane's policy against "retaliation, harassment, or discrimination against persons raising safety or other concerns about operations or quality within" the nuclear power station. In addition, Boggs took action to ensure that the supervisors reviewed their limits of authority and proper channels of communication.

3

Ricks contacted McNeill and told McNeill that he should report to work on Monday, February 15. Over the course of Friday, Saturday, Sunday, and Monday, pump crew supervisor, Tom Brown ("Brown"), Boggs, and Ricks all called McNeill to tell McNeill that Crane was behind him, that Crane had replaced Hall, and that McNeill should report to work. Pappalardo reported back to work and, after completing some forms, he was restored fully to his unescorted access. McNeill decided not to return to work, but instead contacted an attorney.

McNeill filed a complaint with the Occupational Safety and Health Administration; the agency determined that McNeill's complaint lacked merit based on its finding that Crane did not terminate McNeill on February 10, and that McNeill's refusal to complete the work package was not safety related. McNeill requested a hearing pursuant to 29 C.F.R. § 24.4(d)(3). After a formal hearing, the Administrative Law Judge ("ALJ") issued a Recommended Order and Decision concluding that Crane violated the ERA by firing McNeill for engaging in protected activity.

Crane appealed to the ARB which issued its Final Decision and Order on July 29, 2005, reversing the ALJ and denying McNeill's complaint. On September 10, 2005, McNeill filed a motion for reconsideration; while that motion was pending McNeill filed a petition for review in this court. We placed McNeill's petition for review in abeyance pending the ARB's decision on the motion for reconsideration. The ARB denied McNeill's motion on August 25, 2006. We now review the ARB's Final Decision and Order and its Order Denying Reconsideration.[3]

We have jurisdiction pursuant to 42 U.S.C. § 5851(c)(1) which provides that "[a]ny person adversely affected or aggrieved" by the ARB's final decision in an ERA case may obtain review in the United States Court of Appeals where the alleged violation occurred. 42 U.S.C. § 5851(c)(1).

_____

[3]Crane also appears before us as an intervenor.

4

## II. ANALYSIS

McNeill argues that we should reverse both the ARB's Final Decision and Order and the ARB's Order Denying Reconsideration. We examine each claim in turn.

## A. Final Decision and Order

### 1. Standard of Review

We follow the same standard of review under the ERA as that set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. 42 U.S.C. § 5851(c)(1). We will set aside the ARB's findings of fact only if they are unsupported by substantial evidence. 5 U.S.C. § 706(2)(E); *Am. Nuclear Res., Inc. v. United States Dep't of Labor*, 134 F.3d 1292, 1294 (6th Cir. 1998). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir.1987)). We also uphold the agency's application of law to fact if it is supported by substantial evidence. *Id.*

The agency's legal conclusions are reviewed de novo, "although we defer somewhat to the agency because it is charged with administering the statute." *Id.* When "Congress has not directly addressed the precise question at issue," we uphold the agency's statutory interpretation so long as it "is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

### 2. The ERA and the ARB Decision

Under the ERA, "[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee" engaged in an activity protected by the statute. 42 U.S.C.

§ 5851(a)(1). In its Final Decision and Order, the ARB stated that once the complainant reaches the hearing stage of the ERA litigation process, he "must prove by a preponderance of the evidence that he engaged in activity the Act protects, that [the employer] knew about the activity, that [the employer] discharged or otherwise discriminated against him, and that his protected activity was a contributing factor in the adverse action" taken by the employer. J.A. at 126 (Final Decision at 5). Later in the Final Decision and Order, the ARB stated that:

> A complainant seeking relief under § 5851 must prove that his employer took an unfavorable personnel action against him in retaliation for his involvement in protected safety activity. A personnel action pertains to the employee's compensation, terms, conditions, or privileges of employment. An unfavorable or adverse personnel action means a tangible adverse employment action such as a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. As we have already indicated, to prevail, McNeill must prove by a preponderance of the evidence that Crane took a tangible adverse action against him.

J.A. at 134 (Final Decision at 13) (internal quotation marks, citations, and footnote omitted). The ARB denied McNeill's complaint because it determined that McNeill failed to establish by a preponderance of the evidence that he was "terminated" and that, even if he was "terminated," this action was not materially adverse. J.A. at 139 (Final Decision at 18). Harmonizing the language in the statute with the ARB's language in this case, we infer that the ARB interprets the language "discharged or otherwise discriminated against" as requiring that the complainant demonstrate by a preponderance of the evidence that he suffered a "tangible adverse employment action."[4]

---

[4]Although we have no occasion directly to address the issue today, we are puzzled by the ARB's interpretation of the statute. The ERA prohibits employers from "discharg[ing] any employee *or* otherwise discriminat[ing] against any employee." 42 U.S.C. § 5851(a)(1) (emphasis supplied). Based on the plain language of the statute, it appears that the materially adverse employment action inquiry is only relevant to whether an employer's action was "otherwise discriminat[ing]," and that if one is "discharged," the agency may not inquire further into whether the discharge constitutes a

### 3. Materially Adverse Employment Action[5]

McNeill argues that the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, - - U.S. - -, 126 S. Ct. 2405 (2006), applies to ERA claims and that under *White*, the actions taken against him were materially adverse.[6] Both Crane and the Department of Labor correctly argue that, even assuming *White* applies, McNeill has not demonstrated that he has suffered a materially adverse employment action. For purposes of this case, we assume that *White* applies.

In *White*, the Supreme Court held that to demonstrate that an action taken by an employer constitutes retaliation prohibited by Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 126 S. Ct. at 2415 (internal quotation marks omitted). The Court required that the adversity be material because "it is important to separate significant from trivial harms." *Id*. In applying this test,

---

materially adverse employment action. Here, the ARB interpretation appears to require that the petitioner show not only that he was terminated, but that the termination constituted a tangible adverse employment action.

[5]The ARB speaks of a "tangible adverse employment action." J.A. at 134 (Final Decision and Order at 13). In *Burlington Northern & Santa Fe Railway Co. v. White*, - - U.S. - -, 126 S. Ct. 2405 (2006), involving the anti-retaliation provision of Title VII, 42 U.S.C. § 2000e-3(a), the Supreme Court discusses employment actions that are "materially adverse." *Id*. at 2409, 2414-18. For purposes of this opinion, we use these terms interchangeably.

[6]McNeill also argues that he was engaging in protected activity as defined under the ERA. In its Final Order and Decision, the ARB assumed without deciding that McNeill was engaged in protected activity. In addition, McNeill makes arguments about the ALJ's findings that reinstatement was not an appropriate remedy and that an award of monetary damages was correct. The ARB never discussed these findings by the ALJ, because the ARB determined that there was no harm to remedy. Because we accept the ARB's reasoning and deny McNeill's petition for the reasons set forth by the ARB, we have no occasion to analyze these arguments.

7

the *White* decision made clear that "[c]ontext matters," and an act that would not dissuade a worker from engaging in protected activity in one context may dissuade another worker in a different set of circumstances. *Id*.

Applying this test to the facts in *White*, the Court concluded that the plaintiff, who was suspended without pay for thirty-seven days, had experienced retaliation, because, inter alia, a reasonable worker would be dissuaded from making a discrimination claim when it meant surviving for thirty-seven days with no paycheck and with no way of knowing when or if she would be reinstated. *Id*. at 2417. The fact that the plaintiff was eventually reinstated with backpay did not rectify the stress and financial hardship endured during that period. "[A]n indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay." *Id*.

In this case, McNeill argues that the materially adverse employment actions taken against him were as follows: (1) he was terminated and his unescorted access at Cook was denied; (2) he has to report this fact to potential, future employers; and (3) the act of sending him home on February 10, 1999, discourages other employees from refusing to work with defective work packages.[7]

---

[7]At oral argument, McNeill asserted that he did not receive his paycheck in a timely manner and that the delay in receiving his paycheck also constitutes a materially adverse employment action. This assertion appeared nowhere in McNeill's briefs to this court, and the ARB decision does not mention that McNeill experienced a delay in receiving his paycheck. McNeill does not support this allegation with citation to the record. Having examined the Casual Hours and Expense Reports in the Joint Appendix, we conclude that McNeill was paid at the same time as his co-workers.

Since oral argument, Crane filed a motion requesting leave to file a supplemental brief to address McNeill's argument that he did not timely receive his paycheck. Because we find that McNeill's argument lacks merit, there is no need for supplemental briefing on the matter, and we therefore deny Crane's motion.

### a. Whether McNeill Was Terminated and His Unescorted Access Was Denied

McNeill asserts that he was subjected to a materially adverse employment action because he was terminated and his unescorted access was denied. According to the ARB, on February 10, McNeill's access was placed on a routine administrative hold, and he was told both that he would remain on the payroll and that he was not terminated. The ARB found that McNeill was not actually terminated from Crane until effective February 15, when he refused to return to work. Based on the ARB's conclusions, it follows that Crane's actions on February 10th would not have dissuaded a reasonable employee from blowing the whistle. Therefore, the question is whether the ARB's finding of fact is supported by substantial evidence in the record. We answer that question in the affirmative.

The ARB determined that on February 10, McNeill's unescorted access was placed on administrative hold, as opposed to being denied. An administrative hold blocks access into restricted areas of a nuclear facility; it is a temporary and routine measure employed when employees are involved in an "incident." J.A. at 689, 719 (Tr. at 727, 823).

McNeill argues that the ARB was incorrect in concluding that McNeill's access was only on administrative hold on February 10. McNeill reasons that because he was terminated on February 10, and because terminated employees are denied unescorted access, his access must have been denied on February 10th. This argument hinges on the assumption that McNeill was, in fact, terminated on February 10, an assumption not shared by the ARB. The ARB determined that McNeill was not terminated until effective February 15, when he refused to return to work. Therefore, McNeill cannot prevail unless he can demonstrate that the ARB's decision regarding McNeill's termination is unsupported by substantial evidence. The ARB determined that McNeill

9

did not prove by a preponderance of the evidence that Crane terminated his employment, because, inter alia, Hall did not have the authority to terminate McNeill, and Boggs told McNeill that he was not terminated.

McNeill argues that the ARB erred in finding that Hall did not have the authority to terminate McNeill. McNeill's main argument on this point is that there are two memoranda written by Boggs that prove that Hall did, in fact, terminate McNeill. On February 17, Boggs sent a memorandum to Boesch explicating all of the actions that Boggs had taken to remedy the matter. In this memorandum, Boggs wrote that Hall had "terminated" McNeill and Pappalardo but that Crane had kept both men on the payroll and that "the termination was rescinded." J.A. at 319-20 (CX13).

On February 22, Boggs wrote a memorandum to Wayne Prokop, Crane's Director of Operations ("Prokop"), explaining the current status with respect to the situation between McNeill, Pappalardo, and Crane, and referring to the matter as a "termination." J.A. at 321 (CX 14). Boggs later explained that he described the event as a "termination" in these memoranda because that was the word that everyone at Cook was using and he did not want "to introduce any new phrase or terminology into trying to describe the incident." J.A. at 701 (Tr. at 745).

The ARB determined that the word "termination" in these memoranda was not used literally, and that it did not contradict other evidence demonstrating that Hall lacked the authority to terminate McNeill. The ARB supported its finding that Hall did not have the authority to terminate McNeill with the testimony of Boggs, Hall, and Prokop, who all testified that Crane employees could not be fired without Prokop's clearance and without input by Human Resources. J.A. at 136 (Final Order and Decision at 15). This testimony was corroborated by documentary evidence showing that when McNeill was eventually terminated the decision was made by Crane's corporate office in Georgia.

10

The ARB also relied on the fact that McNeill "remained in pay status" and that Boggs told him "early and often" that he was not fired. J.A. at 136 (Final Decision at 15).

Beyond the Boggs memoranda, McNeill's other evidence that Hall had the authority to terminate McNeill consists of the following: (1) that Hall asserted that Boggs never told Hall that he had exceeded his authority with respect to McNeill; (2) that Hall issued work packages to the technicians and oversaw their work; (3) that the word "superintendent" appeared on Hall's hat; (4) that Hall was the superior person representing Crane on site; (5) that Hall asserted that he had authority to make recommendations for termination; and (6) that Hall asserted that he had authority to "give [employees] the rest of the day off or two days off" after reporting an incident to Boggs or Tom Burkey ("Burkey"). J.A. at 500 (Hall Dep. at 27).

Some of this evidence fails on its own terms. The fact that Hall asserted that he had authority to give employees a day off pending the decision of Boggs or Burkey, or that Hall had the authority to recommend termination, actually cuts against the conclusion that Hall had the power to terminate. In addition, the fact that Hall issued work packages tells us nothing about his power to terminate. Hall's assertion that Boggs never told him that he exceeded his authority is belied by the fact that Boggs relieved Hall of his duties on February 15 because of the manner in which Hall handled the situation with McNeill. What is left of McNeill's argument is that Hall oversaw McNeill's work and that Hall was the highest ranking person representing Crane on site.

Although the Boggs memoranda do appear amenable to different interpretations, we conclude that the ARB has pointed to substantial evidence in the record to support its determination that Hall did not have the power to terminate McNeill. A reasonable mind looking at this evidence, could easily conclude that Hall did not have the authority to terminate McNeill. None of McNeill's

11

counter-evidence demonstrates that the ARB reached an unreasonable conclusion. Because McNeill's argument that his unescorted access was denied hinged on his argument that he was terminated on February 10, we will not modify the ARB's fact finding on the access issue either.

Finally, to the extent that McNeill argues that his being sent home on February 10, by itself, constitutes a materially adverse employment action, we reject this position as well. The essence of this argument is that there was a materially adverse employment action based on the fact that McNeill's access was restricted during a two-and-a-half-day period, during which time he was paid and was not required to work. Except for a period of, at most, a few hours, during which McNeill may have believed that he was terminated, McNeill was clearly notified, through his telephone conversation with Boggs, that he was not terminated and that he would not lose any income. Applying *White*, we conclude that a reasonable worker would not be dissuaded from blowing the whistle under these circumstances. Thus, we must uphold the ARB's determination.

### b. Whether McNeill Was Required to Report His Termination & Loss of Access to Potential Future Employers

McNeill argues that he is required to report to any future nuclear-power-plant employers the fact that "he was terminated from employment and his unescorted access to Cook denied." McNeill Br. at 28. He further argues that this required disclosure on future job applications constitutes a materially adverse employment action. In light of our conclusion that substantial evidence supports the ARB's finding that McNeill's access was merely on an administrative hold and that McNeill was not terminated until effective February 15 when he refused to return to work, there is no basis for McNeill's assertion that he must report to future employers that he lost his unescorted access or that

12

he was terminated as the result of the events on February 10. Accordingly, McNeill can not prevail on this theory.

### c. Whether Other Employees Were Discouraged From Working Defective Packages

McNeill also argues that Crane's actions towards him created a chilling effect that would reasonably cause other workers to refrain from engaging in protected activity. In support of his argument, McNeill states that after McNeill was "fired," employee Jason Delashmette ("Delashmette") believed his job was in jeopardy if he did not work the deficient work package. Delashmette's affidavit alleged that after McNeill and Pappalardo were "fired," Brown approached Delashmette and said that he was to work the package as written or he would also be fired. J.A. at 317 (Delashmette Aff. at ¶ 5).

The problem with this argument is that it focuses only on whether Delashmette suffered a materially adverse employment action. In this case, our concern is with whether the petitioner, McNeill, suffered a materially adverse employment action. In *White*, the Supreme Court explained that courts were to determine whether the "challenged action" is materially adverse. *White*, 126 S. Ct. at 2415. In this case, the challenged action is that Crane allegedly terminated McNeill and denied him unescorted access to Cook. We have already concluded that the ARB's finding that McNeill was not terminated and that his access was not denied is supported by substantial evidence. Under these circumstances, whether Delashmette may have been negatively affected by hearing that McNeill was terminated is irrelevant.

Further, as we have pointed out earlier in this opinion, the record establishes that Crane acted swiftly and thoroughly to assuage any potential notion that employees could not safely engage in

13

activity protected by the ERA. Accordingly, McNeill has not established that Crane's actions created a chilling effect.

### d. Conclusion

Assuming, without deciding, that the standards announced by the Supreme Court in *White* apply to the case at bar, we conclude that McNeill is unable to show that the ARB erred in finding that Crane did not take any materially adverse employment action against McNeill. Accordingly we deny McNeill's petition for review of the ARB's Final Decision and Order.

## B. Order Denying Reconsideration

In his motion for reconsideration, McNeill asked the ARB to reopen his case in order to permit him to supplement the record with further documentary evidence which, he argues, established that he was terminated. McNeill's motion to reconsider was based on his belief that the ARB should reopen the case to consider evidence not in the record. The ARB determined that it was subject to the same standard for reopening a record as was the ALJ who originally presided over the hearing, i.e., it could not reopen the record unless the party movant demonstrated that there was "'new and material evidence [that] has become available which was not readily available prior to the closing of the record.'" J.A. at 275 (Order Denying Recons. at 4) (quoting 29 C.F.R. § 18.54(c)).

McNeill does not set forth what the standard of review is for evaluating the ARB's Order Denying Reconsideration. Crane argues that we should review for an abuse of discretion. In *Belt v. United States Dep't of Labor*, 163 F. App'x 382 (6th Cir. 2006) (unpublished), we applied the abuse-of-discretion standard to review an ARB decision refusing to reopen its final decision. *Id*. at 389-90. Under any standard of review, however, McNeill's argument that the ARB erred in denying his motion is without merit.

14

The ARB rested its denial of reconsideration on three grounds, one of which was that McNeill did not demonstrate that the documents he proffered were "not readily available" before the ARB issued its Final Decision and Order in July 2005. J.A. at 278 (Order Denying Recons. at 6). The ARB reasoned that Crane asserted (and McNeill did not dispute) that McNeill had acquired the documents in question no later than October 2003. This was more than one and one-half years before the ARB issued its Final Decision and Order.

McNeill failed to provide the ARB with any reason for his failure to move to reopen the record while the case was still pending with the ARB. On appeal, McNeill again fails to address why he did not move to reopen the record while the case was pending with the ARB. Because McNeill has provided us with no argument to contradict the ARB's reasoning, the ARB decision stands. Accordingly, we deny McNeill's petition for review with respect to the Order Denying Reconsideration.

### III. CONCLUSION

For the foregoing reasons, we **DENY** the petition for review.