NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0756n.06

**No. 12-5643**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

GARY VANDER BOEGH,          )
                            )
    Plaintiff-Appellant,    )
                            )
    v.                      )
                            )
ENERGYSOLUTIONS, INC.;      )
PADUCAH REMEDIATION SERVICES, LLC;   )
BECHTEL JACOBS COMPANY, LLC,   )
                            )
    Defendants-Appellees.   )
                            )

**FILED**
*Aug 14, 2013*
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

BEFORE: GRIFFIN and KETHLEDGE, Circuit Judges; and ZATKOFF, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiff Gary Vander Boegh engaged in a range of protected activity as landfill manager at the Paducah Gaseous Diffusion Plant ("PGDP"), reporting several environmental violations. At relevant times, Vander Boegh worked for defendant-contractor Bechtel Jacobs Company ("BJC") until BJC subcontracted with WESKEM to handle waste management, at which time Vander Boegh transitioned to WESKEM. Subsequently, defendant-contractor Paducah Remediation Services ("PRS") took over the PGDP contract and subcontracted with defendant EnergySolutions to handle waste management. Vander Boegh claims that he was purposely drafted out of PRS's bid on the PGDP contract as part of a "retaliatory course" to end his employment. Ultimately, EnergySolutions

---

[*]The Honorable Lawrence P. Zatkoff, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

employee John Kelly decided not to hire Vander Boegh as landfill manager. Thus, when the transition from BJC-WESKEM to PRS-EnergySolutions was complete, Vander Boegh's employment terminated. Vander Boegh filed an action alleging retaliation under various federal environmental statutes. The district court granted summary judgment in favor of all defendants. For the reasons that follow, we reverse the summary judgment granted in favor of EnergySolutions, affirm the summary judgment granted in favor of PRS and BJC, and remand for further proceedings consistent with this opinion.

I.

The Department of Energy ("DOE") hired Vander Boegh in 1992 to work at the PGDP, where he became a certified landfill manager. In 1998, DOE awarded the PGDP contract to BJC. In 2000, BJC subcontracted with WESKEM to handle waste management. Throughout these transitions, Vander Boegh maintained his landfill manager position.

As landfill manager, Vander Boegh was responsible for ensuring that the disposal of nuclear waste complied with the applicable laws, regulations, and permit requirements. In particular, there were standards pertaining to leachate[1] management and disposal, and the Kentucky Division of Waste Management ("KDWM") required key personnel disclosure statements from the landfill manager as part of the permit application process.

On February 2, 2001, Vander Boegh circulated comments to management expressing concerns regarding leachate storage capacity and leakage from the landfill. On March 4, 2001,

---

[1]Leachate is the liquid substance that drains from a landfill. It contains environmentally harmful material that can pose a threat to the natural water source if not collected properly.

Vander Boegh sent an email to management warning that leachate volumes had reached critical levels. Thereafter, BJC employee Kevin Barber became increasingly threatening toward Vander Boegh and indicated during a meeting that Vander Boegh's key personnel disclosure statements were not required and would not be submitted to KDWM. According to Vander Boegh, not submitting his disclosure statements would have threatened his job as landfill manager. Vander Boegh further alleged that, in October 2001, BJC and WESKEM managers began concealing the facility's deficiencies from KDWM and attempted to eliminate Vander Boegh's support staff.

In December 2001 and January 2002, Vander Boegh filed whistleblower complaints through DOE's Employee Concern Program ("ECP"). According to Vander Boegh, a few months later, BJC attempted to remove him from the permit by requesting elimination of his key personnel disclosure statements.

On February 28, 2002, Vander Boegh met with approximately thirty individuals, including BJC's attorney. At the meeting, Vander Boegh indicated that BJC had misidentified certain hazardous waste, which would result in Notices of Violation from the KDWM. BJC's attorney told Vander Boegh not to contact KDWM regarding the errors. In November 2002, KDWM issued Notices of Violation against DOE for improper disposal of hazardous waste, which Vander Boegh had reported.

In July 2003, the DOE hearing officer who considered Vander Boegh's whistleblowing allegations found several instances of retaliation, including harassment and intimidation by Barber. The hearing officer directed BJC to refrain from changing Vander Boegh's job status for at least one year.

Subsequently, DOE decided to solicit new bids for the PGDP contract and issued a request for proposals. Although Northwind Corporation won in the initial bidding process, DOE decided to perform a rebid after receiving a complaint from PRS. To prepare the waste management portion of its bid, PRS subcontracted with Duratek Federal Services, which EnergySolutions ultimately acquired.[2] By then, Barber had left BJC to work for EnergySolutions, and he helped prepare PRS's bid. Barber testified that the bid language was reviewed and approved by PRS management. PRS won the rebid and subcontracted with EnergySolutions to take over the waste management duties previously performed by WESKEM. Like previous PGDP contracts, the contract entered into by PRS contained a provision defining "grandfathered employees" and granting them "a preference in hiring for vacancies for non-managerial positions," including "a right of first refusal for vacancies . . . in positions substantially equivalent to the positions they currently perform."

Beginning in January 2006, operations at the PGDP were transitioned from BJC-WESKEM to PRS-EnergySolutions. During the transition, EnergySolutions employee John Kelly was assigned as project manager for material disposition, responsible for performing "due diligence" during the transition period. His job was to ensure a smooth transition from the current contractors to the new contractors in the area of material disposition. According to Kelly, he had complete discretion in selecting the landfill manager under the new contract. When Kelly first arrived, he knew that Vander Boegh was the landfill manager under the previous contract because his name was listed on the organizational chart, but Kelly never had occasion to personally interact with Vander Boegh.

---

[2]Although the acquisition occurred sometime after the transition, to avoid confusion, Duratek Federal Services will be referred to hereinafter as EnergySolutions, the named defendant in this case.

On February 13, 2006, Vander Boegh met with the "contract transition team" that reported to Kelly, including EnergySolutions employee Paul Corpstein. Vander Boegh gave a presentation describing WESKEM's landfill operations and management. Afterward, he asked Corpstein about EnergySolutions' free liquid problems and commented about the leachate storage issues at the PGDP.

On February 14, 2006, Vander Boegh met with PRS officials John Razor and Mike Spry to inform them that BJC's report, which indicated that his whistleblower complaints had been resolved, was incorrect. Razor responded that those complaints had "nothing to do with [them]," though Spry was able to access Vander Boegh's pending claim online to see that it was unresolved. After discussing the leachate storage capacity design flaws of the new leachate treatment plant, Vander Boegh asked Razor how he would know when to apply for the landfill manager position under the new contract. Razor told Vander Boegh to look for the job posting on PRS's website.

On February 21, 2006, Vander Boegh filed a third ECP whistleblower complaint, claiming that Barber had been instrumental in removing Vander Boegh and inserting himself as the landfill manager in PRS's bid. Although the bid did not identify the landfill manager by name, according to Vander Boegh, Barber envisioned himself in the position and described the landfill manager as an individual having his own credentials. Corpstein also stated that Barber had visions of himself becoming the landfill manager. According to Corpstein, the reason that Barber did not become the landfill manager was because he decided to leave the company before the end of 2005.

Barber, however, testified that he had no interest in obtaining the position and the bid described the landfill manager according to the requirements set forth in DOE's request for

proposals. Vander Boegh, on the other hand, averred that DOE's request for proposals did not specify the qualifications for the landfill manager and no other bidder included such qualifications for the position in their proposals. Further, as described in an unidentified OSHA document, PRS's bid on the PGDP contract "identified a State of Kentucky Certified Landfill Manager with 12 years of experience coming to the job. That manager was identified through interviews as Kevin Barber. However, Mr. Barber left [EnergySolutions] before the transition of work . . . ." Asked in his deposition whether he "describe[d] the anticipated holder of the landfill manager position in a way that [matched his] own qualifications and experience," Barber replied, "I don't recall writing any such text." Asked whether there was "an intent or plan" to draft the bid in a manner that would exclude Vander Boegh from the landfill manager position, Barber replied, "I don't remember preparing or suggesting any such language."

Kelly oversaw and worked closely with Corpstein, who was transferred to the PGDP to assist in the transition. Within two weeks of his arrival at the PGDP, Corpstein expressed interest in the landfill manager position, and in a conversation with Kelly, he offered to take the job. According to Corpstein, Kelly verbally offered him the landfill manager position sometime in late February or the first week of March 2006.

Corpstein was the only candidate whom Kelly considered for the landfill manager position. The position was never posted, and no interviews were conducted. According to Kelly, no one told him not to hire Vander Boegh, and he was unaware of Vander Boegh's whistleblower complaints when he made the hiring decision. Kelly also claims that he was unaware that Vander Boegh had raised concerns of safety or regulatory compliance with regard to the landfill's leachate capacity at

that time. Allegedly, Kelly did not learn of Vander Boegh's leachate concerns until he attended meetings in mid-late March or early April. James Hopper, EnergySolutions' senior vice president, endorsed the decision to hire Corpstein as landfill manager, a decision which Hopper says occurred in late February or the first week of March 2006.

At the time of his hire, Corpstein did not hold the proper certification for the landfill manager position. On March 9, 2006, he applied for the necessary training.

EnergySolutions employee Matt LaBarge also reported to Kelly during the transition. LaBarge knew early on that Vander Boegh was interested in the landfill manager position. To LaBarge's knowledge, Kelly knew about Vander Boegh's protected activities sometime before April 24, 2006. Through second channels, LaBarge learned that Vander Boegh met with Spry and Razor on February 14, 2006. However, he does not know what was said at the meeting. Asked whether he was aware that Vander Boegh had complained to management on March 15, 2006, regarding the concern of a leachate spill, LaBarge stated that he had seen emails about the concern. He saw a couple emails that were sent in late March and early April.

On February 24, 2006, Vander Boegh filed a fourth ECP whistleblower complaint, alleging that DOE, BJC, and PRS were conspiring to end his employment due to his protected activities. Later that day, he attended a permit review meeting. Kelly, Corpstein, and LaBarge were in attendance. During the meeting, Vander Boegh raised the issue of key personnel disclosure statements, but a member of the PRS compliance staff told him that the topic would not be part of the discussion that day.

On March 10, 2006, Vander Boegh sent a letter to Razor and Spry noting leachate storage tank deficiencies and treatment plant design deficiencies, including a failure to treat radiological contaminants. On March 15, 2006, he issued a "Stop Work Order" that halted operations to prevent an imminent overflow of potentially contaminated leachate. On March 16, 2006, Razor replied to Vander Boegh's letter, thanking him for bringing the information to their attention.

On March 14–15, 2006, PRS's website advertised a job opening for certified landfill manager. On April 12, 2006, Vander Boegh interviewed for what he thought was the landfill manager position, but he was informed at the interview that he was not being considered for that position. LaBarge testified that Vander Boegh was interviewed instead for a field engineer position.

On April 3, 2006, PRS submitted a certified statement indicating that the continuation or change in the certified landfill manager would be addressed after hiring. On April 13, 2006, DOE sent a letter to KDWM indicating that the selection of the certified landfill manager was not yet complete, but that Corpstein had been hired for the job and was anticipated to become the certified landfill manager.

Corpstein's application for training was approved on March 21, 2006, and he was approved as the "interim landfill manager" on April 19, 2006. Corpstein signed the offer letter for the landfill manager position in mid-April. Corpstein attended training on May 17–19, 2006, and he received his certification on May 26, 2006.

On April 23, 2006, the transition was complete—BJC-WESKEM ceased activities, and Vander Boegh's employment terminated. Vander Boegh filed an employment discrimination complaint with the Department of Labor. He removed the action to federal district court pursuant

to 42 U.S.C. § 5851(b)(4). The complaint alleged retaliation in violation of the Energy Reorganization Act ("ERA") (Count I); the Federal Claims Act ("FCA") (Count II); and other environmental statutes (Count III). Defendants moved for summary judgment.

The district court held that EnergySolutions was entitled to summary judgment because no genuine issue of material fact existed that (1) the relevant adverse employment action occurred no later than March 9, 2006, when Kelly hired Corpstein; and (2) Kelly had neither actual nor imputed knowledge of Vander Boegh's protected activity at that time. It held that PRS and BJC were entitled to summary judgment because no genuine issue of material fact existed that they did not influence the hiring decision. This appeal followed.

## II.

We review de novo a district court's grant of summary judgment. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *CareToLive v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011).

"To state a claim under the whistleblower provision of an environmental statute, the plaintiff must establish that his employer retaliated against him because he engaged in a protected activity." *Sasse v. U.S. Dep't of Labor*, 409 F.3d 773, 779 (6th Cir. 2005). In general, a prima facie case of retaliation requires the plaintiff to show that (1) he engaged in protected activity; (2) the employer had knowledge of the protected activity; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected activity and the adverse employment action. *Wasek*

*v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468–69 (6th Cir. 2012). Similarly, the ERA requires the plaintiff to demonstrate that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) the protected activity was a "contributing factor" in the adverse employment action. 42 U.S.C. § 5851(b)(3)(C); *TVA v. U.S. Sec'y of Labor*, 59 F. App'x 732, 738 (6th Cir. 2003).

III.

We first address whether the district court properly granted summary judgment in favor of EnergySolutions. EnergySolutions does not dispute that Vander Boegh engaged in protected activity and suffered an adverse employment action. The issues in dispute are (1) when the relevant adverse employment action occurred; (2) whether the decisionmaker had actual or imputed knowledge of Vander Boegh's protected activity at that time; and (3) whether Vander Boegh lacks standing to bring a FCA claim against EnergySolutions.[3]

Vander Boegh argues that a genuine issue of material fact exists whether an adverse employment action occurred in fall 2005 when Barber, then employed by EnergySolutions, drafted the waste management portion of PRS's bid so as to eliminate Vander Boegh as the landfill manager and insert himself into that role. PRS's bid did not identify the landfill manager by name. Nonetheless, Vander Boegh points to a statement made by Corpstein to a Department of Labor investigator that Barber had visions of himself becoming the landfill manager. Vander Boegh also relies on an unidentified OSHA document. The document indicates that the landfill manager in

---

[3]The dissent questions whether Vander Boegh has statutory standing to sue under the ERA. This issue was not raised below, it was not briefed on appeal, and it was not discussed at oral argument. We, therefore, conclude that *sua sponte* consideration would be improper.

PRS's bid was identified during OSHA interviews as Barber and the plan for Barber to take that position never transpired because he left the company before the transition. Lastly, Vander Boegh emphasizes Barber's documented history of retaliating against him, citing the DOE decision issued in 2003.

In contrast, Barber testified that he drafted the description of the landfill manager according to the requirements set forth in DOE's request for proposals. Barber also testified that he had no interest in obtaining the landfill manager position. Asked whether he had "describe[d] the anticipated holder of the landfill manager position in a way that [matched his] own qualifications and experience," Barber replied, "I don't recall writing any such text." Asked whether there was "an intent or plan" to draft the bid in a manner that would exclude Vander Boegh from the landfill manager position, Barber replied, "I don't remember preparing or suggesting any such language."

The district court erroneously reasoned that EnergySolutions was entitled to summary judgment because Vander Boegh failed to demonstrate that the bid language "constituted a decision to terminate [him]" or "precluded him from obtaining the landfill manager position." These were improper inquires. Actionable retaliation is not limited to so-called "ultimate employment decisions" that adversely alter the terms and conditions of employment. *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 64, 67 (2006) ("A provision limited to employment-related actions would not deter the many forms that effective retaliation can take."). Rather, an adverse employment action in the retaliation context requires a showing "that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded

a reasonable worker from [engaging in protected activity]." *Id*. at 68 (internal quotation marks omitted).

Still, Vander Boegh has failed to demonstrate a genuine issue of material fact whether the bid language was materially adverse. Most significantly, Vander Boegh has failed to include in the record the bid terms that he alleges were drafted to mirror Barber's qualifications. Without reviewing the bid language, we are unable to determine whether a reasonable jury could find by a preponderance of the evidence that those terms were materially adverse. Likewise unavailing is Vander Boegh's bare assertion that the DOE's request for proposals did not require specifications for the landfill manager position. This may or may not be correct; but there is nothing in the record to support it. Thus, we are left with Barber's testimony, which appears straightforward. Accordingly, we conclude that Vander Boegh is unable to establish that PRS's bid language was materially adverse.[4]

As a claimed second adverse employment action, Vander Boegh points to Kelly's decision not to hire him as landfill manager. Undisputedly, the decision not to hire Vander Boegh constitutes an adverse employment action. The issue is when the decision occurred. The district court held that the decision to hire Corpstein was made no later than March 9, 2006. Vander Boegh, however, argues that a genuine issue of material fact exists whether that decision occurred as late as mid-April 2006. We disagree.

---

[4]Despite this holding, we are troubled by the circumstances surrounding the drafting process. EnergySolutions chose Barber, an individual with a documented history of retaliating against Vander Boegh, to draft the waste management portion of PRS's bid. Vander Boegh could have argued that the selection itself of Barber would dissuade a reasonable worker in his position from engaging in further protected activity. However, Vander Boegh has not made such a claim.

The record supports the finding that the decision to hire Corpstein occurred no later than March 9, 2006, as the district court determined. Corpstein testified that Kelly verbally offered him the landfill manager position sometime in late February or the first week of March 2006. Hopper, EnergySolutions senior vice president (who endorsed the decision to hire Corpstein), also testified that the decision was made in late February or the first week of March 2006. Finally, Corpstein applied for the necessary training to become a certified landfill manager on March 9, 2006.

The evidence on which Vander Boegh relies does not create a genuine issue of material fact whether the decision occurred later. First, the fact that Corpstein did not sign the offer letter for the landfill manager position until mid-April is not inconsistent with the decision having been made much earlier. Signing the offer letter simply memorialized a decision previously made. Second, although PRS's website advertised a job opening for landfill manager as late as March 15, 2006, no one other than Corpstein was ever considered or interviewed for the landfill manager position. Although Vander Boegh arrived at an interview with the belief that he was being considered for the landfill manager position on April 12, 2006, it was made clear to him during the interview that he was not being considered for that position.

Likewise, evidence that PRS submitted a certified statement to KDWM dated April 3, 2006, indicating that the continuation or change in the certified landfill manager would be addressed after hiring, is consistent with Kelly having already hired Corpstein, given that he lacked certification at the time. There could be no official change in the certified landfill manager until Corpstein received his certification. Corpstein applied for the necessary training on March 9, 2006, and he received his certification on May 26, 2006.

Finally, although DOE sent a letter to KDWM dated April 13, 2006, indicating that the selection of the landfill manager was not yet complete, what Vander Boegh fails to mention is that the letter also states that Corpstein had been hired for the job and was anticipated to become the certified landfill manager. Thus, the letter to KDWM lends further support to the district court's determination that the hiring decision had already occurred. Accordingly, Vander Boegh has not presented evidence from which a reasonable jury could find that the decision to hire Corpstein occurred after March 9, 2006.

The remaining issue is whether Kelly knew of Vander Boegh's protected activity before March 9, 2006. "The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation." *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007) (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002)). Actual knowledge can be established through direct evidence that the decisionmaker knew of the protected activity or through circumstantial evidence from which a reasonable jury could infer that the decisionmaker knew of the protected activity. *Mulhall*, 287 F.3d at 552–53. A decisionmaker's disavowal of knowledge may be rebutted with countervailing evidence. *See Lippert v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1282 (11th Cir. 2006).

We reject many of Vander Boegh's arguments on the issue of actual knowledge. First, Vander Boegh argues that Kelly acquired knowledge of his protected activity at a meeting held on February 24, 2006. According to Vander Boegh, those in attendance included Kelly, Corpstein, and LaBarge. During this meeting, Vander Boegh raised the issue of key personnel disclosure statements, but a member of the PRS compliance staff told him that the topic would not be

discussed. This exchange did not reveal any information about Vander Boegh's protected activity. Thus, no one at the meeting acquired knowledge of Vander Boegh's protected activity.

Second, much of the evidence on which Vander Boegh relies came too late. LaBarge testified that Kelly knew about Vander Boegh's protected activity sometime before April 24, 2006. Vander Boegh argues that Kelly acquired knowledge of his protected activity based on the "Stop Work Order," which issued on March 15. He also points to Kelly's attendance at meetings in mid-late March or early April at which leachate concerns were discussed, as well as email chains sent during this same time frame. Finally, Vander Boegh calls attention to alleged departures from procedure that occurred in April. But none of this evidence shows that Kelly had knowledge of Vander Boegh's protected activity before March 9, 2006.

Vander Boegh also argues that an employer's failure to follow its normal procedure can provide circumstantial evidence of a retaliatory motive and, thus, actual knowledge of protected activity. *See DeFord v. Sec'y of Labor*, 700 F.2d 281, 287 (6th Cir. 1983). In particular, Vander Boegh claims that the contract provision granting "grandfathered employees" a hiring preference for vacancies, including a right of first refusal in the job they currently perform, was not followed. The PGDP contract entered into by PRS does, in fact, contain a provision providing this hiring preference, and Vander Boegh maintained his position through all previous contract transitions. Further, one could reasonably infer that Kelly read the contract as part of his due diligence responsibility during the transition. The flaw in the argument, however, is that Vander Boegh has failed to present any evidence beyond his personal belief that he was a grandfathered employee

under the new contract. Only "non-managerial" employees are considered "grandfathered" under the contract, and the landfill manager position is specifically denoted as "managerial."

Nonetheless, other circumstantial evidence supports Vander Boegh's claim. Vander Boegh filed a complaint with DOE on February 21, 2006, and another on February 24, 2006. These complaints were readily available on DOE's website. Further, Kelly was responsible for overseeing the transition of landfill operations and managing "due diligence" during the transition period, specifically in the area of material disposition. Despite his due diligence responsibility, Kelly declined to so much as interview Vander Boegh, who has well over a decade of experience as a certified landfill manager.

We conclude that a reasonable jury could infer that Kelly, the individual responsible for performing due diligence in the area of material disposition, would have discovered environmental complaints regarding the landfill's leachate storage capacity, either through the DOE's website or through other channels. Kelly was also responsible for hiring a landfill manager. Under these circumstances, it was likewise reasonable for a jury to infer that, as part of the hiring process, Kelly would have acquired information regarding the current landfill manager and his protected activities, even though he ultimately selected Corpstein. These duties, after all, were part of Kelly's job. The dissent describes Kelly as "a very busy man" with "a busy schedule and numerous responsibilities." This only furthers our point. Kelly's job duties included performing due diligence and hiring a landfill manager—these were the tasks with which Kelly allegedly "busied" himself.

For these reasons, the circumstantial evidence establishes a genuine issue of material fact whether Kelly had actual knowledge of Vander Boegh's protected activity. The district court erred in concluding otherwise.

Vander Boegh also advances an alternative "imputed knowledge" or "cat's paw" theory of liability, which originated in the employment discrimination context. The district court seemed to operate under the assumption that this theory is available in a retaliation case such as this, explaining that "[k]nowledge of a plaintiff's protected activities may also be imputed to a decision maker under the 'cat's paw' theory." EnergySolutions appears to assume the same in its briefing. But the availability of cat's paw theory to impute knowledge of protected activity to the decisionmaker is less than clear under this court's precedent, and for this reason, it may become necessary for the district court to analyze the issue on remand. *See Arendale v. City of Memphis*, 519 F.3d 587, 603–04 & n.13 (6th Cir. 2008) (recognizing "cat's paw" as a theory of imputing *discriminatory bias*). To the extent that "cat's paw" theory is available, we conclude that genuine issues of material fact exist whether Corpstein learned of Vander Boegh's protected activity before March 9, 2009, and thereafter influenced Kelly's hiring decision. On February 13, 2006, Vander Boegh spoke with Corpstein and commented about the leachate storage problems at the PGDP. Corpstein and Kelly worked closely together, and within two weeks of his arrival at the PGDP, Corpstein told Kelly that he was interested in the landfill manager position and offered to take the job.

Finally, EnergySolutions argues that Vander Boegh's retaliation claim under the FCA fails as a matter of law because Vander Boegh was never employed, managed, or supervised by EnergySolutions. *See* 31 U.S.C. § 3730(h)(1) (limiting relief from retaliatory acts to "any employee,

contractor, or agent"). The district court did not reach this issue. In light of the above analysis, reversing the grant of summary judgment, we direct the district court to address this issue on remand.

IV.

Next, we address whether the district court properly granted summary judgment in favor of PRS because Vander Boegh failed to establish a prima facie case. As discussed above, Vander Boegh has failed to create a genuine issue of material fact whether the bid language was materially adverse and, consequently, cannot succeed in a retaliation claim based on this event.

Vander Boegh also cannot establish a prima facie case against PRS based on Kelly's decision to hire Corpstein. Assuming that "cat's paw" theory is even available in this context, insufficient evidence exists that PRS officials had any influence over Kelly's decision to hire Corpstein. The involvement of management was far too tenuous to create a question of fact for a jury. Accordingly, the district court properly granted summary judgment in favor of PRS.

V.

Finally, we conclude that the district court properly granted summary judgment in favor of BJC. At the outset, BJC clearly had knowledge of Vander Boegh's protected activity when Kelly decided not to hire Vander Boegh; a DOE hearing officer had found several instances of retaliation years earlier. Assuming the availability of "cat's paw" theory, however, there is scant evidence in the record that BJC influenced that decision.

Vander Boegh presents the following evidence of BJC's alleged influence: The CEO of WESKEM recalls a BJC employee making a critical remark about Vander Boegh, but he could not

remember the person's identity. Asked whether BJC's management worked with PRS management during the transition, the CEO replied, "it has to have occurred." The CEO also said that it was "likely" that some of BJC's management involved in the transition were those who had expressed dissatisfaction with Vander Boegh. On March 9, 2006, a BJC representative spread a rumor that Vander Boegh's security clearance had been revoked. BJC failed to identify Vander Boegh as a "grandfathered employee" for purposes of continued employment.

This evidence is largely speculative and insufficient to create a genuine dispute. Evidence that a critical remark was made does not show that it influenced the hiring decision. Testimony that an event "has to have occurred" or was "likely" is mere conjecture. Even assuming that BJC was involved in the overall transition process, this is not evidence that BJC influenced the selection of employees. Moreover, BJC would have had no motive to involve itself in hiring decisions of another company's employees. With regard to the alleged rumor, because it was spread after Kelly hired Corpstein, it could not have influenced the decision. Finally, as explained above, Vander Boegh was not a "grandfathered employee" because the landfill manager position was denoted as "managerial." Accordingly, the district court properly granted summary judgment in favor of BJC.

VI.

For these reasons, we reverse the summary judgment granted in favor of EnergySolutions, affirm the summary judgment granted in favor of PRS and BJC, and remand for further proceedings consistent with this opinion.

**ZATKOFF**, District Judge, dissenting in part.

I agree with the majority in regard to affirming summary judgment for PRS and BJC. With respect to EnergySolutions, however, I disagree that Vander Boegh has created a genuine issue of fact regarding Kelly's knowledge of the protected activity. I also question whether Vander Boegh has statutory standing to bring his ERA claims against EnergySolutions in the first place. Accordingly, I respectfully dissent.

**I. KELLY'S KNOWLEDGE**

"The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation." *Frazier v. USF Holland, Inc.*, 250 F.App'x 142, 148 (6th Cir. 2007) (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002)). While in most cases "the plaintiff will be able to produce direct evidence that the decision making officials knew of the plaintiff's protected activities," the lack of such direct evidence is not necessarily fatal if circumstantial evidence can establish this element of the claim. *Mulhall*, 287 F.3d 552–53.

Kelly testified that he was not aware of Vander Boegh's protected activities before making the decision to hire Corpstein, and that he did not become aware of the protected activities until mid-to-late March or early April, 2006. Although this denial may be rebutted with countervailing evidence, *see Lipper v. Cmty. Bank, Inc.*, 438 F.3d 1275, 1282 (11th Cir. 2006), such evidence must amount to more than just "conspiratorial theories . . . or 'flights of fancy, speculations, hunches, intuitions, or rumors.'" *Mulhall*, 287 F.3d 552 (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)). *See also Menne v. Celotex Corp.*, 861 F.2d 1453, 1463 (10th Cir. 1988) (finding that the inference drawn from the evidence "must not be based on

conjecture, speculation, or mere possibility"); *Lisa-Jet, Inc. v. Duncan Aviation, Inc.*, 569 F.2d 1044 (8th Cir. 1978) (same); *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1163 (4th Cir. 1986) ("permissible inferences must . . . be within the range of reasonable probability") (citation omitted).

The evidence offered by Vander Boegh and cited by the majority is: (1) that Vander Boegh filed complaints with DOE on February 21, 2006, and February 24, 2006, and that both complaints were viewable on DOE's website; (2) that Kelly was responsible for overseeing the transition of landfill operations and managing "due diligence" during the transition period; (3) that on February 13, 2006, Vander Boegh spoke with Corpstein and commented about the leachate storage problems at the PGDP; and (4) that despite his due diligence responsibility, Kelly decided to hire Corpstein without interviewing Vander Boegh, who had over a decade of experience as a certified landfill manager. Although this evidence may create a factual issue as to whether Kelly *could have* discovered the protected activity before deciding to hire Corpstein, I do not find that it creates a factual issue as to whether Kelly *did* have such knowledge. Rather, inferring Kelly's knowledge of the protected activity requires "conspiratorial theory," conjecture and speculation. *E.g.*, *Mulhall*, 287 F.3d at 552; *Menne*, 861 F.2d at 1463.

First, there is no evidence from which to infer that Kelly must have checked the DOE website before deciding to hire Corpstein. Vander Boegh made his first complaint on February 21, 2006. According to Kelly's testimony, he was a very busy man during the transition, often working 15 hours a day. He also testified that only 10–20% of his time was devoted to Landfill matters. Even assuming that Kelly offered Corpstein the job on March 9, 2006, there is no evidence nor is it inferable that after February 21—but before March 9—Kelly checked the DOE website, especially

given his busy schedule and numerous responsibilities at the time. Indeed, the evidence is entirely consistent with Kelly checking the DOE's website *after* having decided to hire Corpstein (e.g., on March 10).

Second, the evidence that Corpstein had knowledge of the protected activity is tenuous. Vander Boegh claims that at the February 13, 2006, meeting, he asked Corpstein about EnergySolutions' free liquid problems and "commented about the leachate storage issues at the landfill." (R.48-2 at 18–19; Pg ID at 801–02.) On its face, this comment does not allude to a particular protected activity by Vander Boegh, but instead appears to have been a vague reference to the conditions at the landfill. Even assuming that Corpstein was present at the meeting—which remains in question—and that Vander Boegh made the comment, it does not necessarily follow that Corpstein translated the comment into knowledge of Vander Boegh's protected activity.

Third, the fact that Kelly hired Corpstein without having interviewed Vander Boegh neither indicates foul play nor gives rise to an inference that Kelly had knowledge of the protected activity, especially when considering the context in which Kelly made the decision. Kelly testified that:

> After working with Mr. Corpstein on a daily basis and becoming familiar with his experience and credentials, *which included landfill management and waste disposal*, and *based on my favorable impressions of Mr. Corpstein's skills and work ethic*, I made the decision to hire Mr. Corpstein . . . as the Landfill Manager . . . . I consulted with my manager at the time[,] . . . Pat Hopper, on this decision prior to finalizing the action. Mr. Hopper endorsed my decision and agreed that Mr. Corpstein was well qualified for the position of Landfill Manager.

(R. 40-4 at 13–15; Pg ID at 343–45) (emphasis added). Kelly's high regard for Corpstein is also corroborated by Hopper's testimony. The testimony confirmed that Kelly communicated to Hopper the decision to hire Corpstein and that Hopper endorsed the decision on account of Corpstein's

credentials and experience. Hopper also noted that there was nothing unusual about Kelly, the most senior Duratek employee, hiring Corpstein, another longtime Duratek employee who contributed in the transition. In fact, Hopper noted that whenever EnergySolutions transitioned into a new site and replaced an existing contractor, it brought its own management team to replace the previous contractor's managers, and that this is a common practice in the industry. The testimony of Hopper and Kelly regarding Corpstein's hiring was not rebutted by Plaintiff.

For his part, Vander Boegh finds it peculiar that he did not receive an interview despite having ten years of experience and—unlike Corpstein—the proper licensure for the position. This is insignificant. Corpstein was by no means a novice employee. He had worked for Duratek/EnergySolutions for more than 20 years and was a Senior Project Manager before transferring to the Landfill to aid in the transition. Also, as attested to by Kelly and Hopper, Corpstein further proved his worth during the long hours he spent working closely with and reporting to Kelly during the transition. As to the licensure, it appears to have been little more than a paperwork formality having no bearing on Corpstein's ability to perform the duties of Landfill Manager. In fact, the licensure appears to have been so insignificant that the KDWM allowed Corpstein to perform all the duties of Landfill Manager without him having participated in the training class or received his certification—albeit while having the title of "interim" Landfill Manager until such time as he could complete the class. The class, however, took all of three days and, exactly one week after completing it, Corpstein received his full certification.

In sum, viewing the circumstantial evidence as a whole does not give rise to a reasonable inference that Kelly had knowledge of the protected activity. Vander Boegh presented no evidence

that Kelly checked the DOE website and learned of the complaints, or that Kelly did so during the approximately 2 week window between the first complaint and the hiring of Corpstein. Rather, the evidence is such that Kelly had the *opportunity* to learn of the protected activity—*if* he had checked the DOE website between February 21 and March 9. Nor has Vander Boegh produced sufficient evidence that Corpstein had knowledge of the protected activity and shared it with Kelly, or that Kelly declined to interview Vander Boegh based on such knowledge. Again, there is no evidence that Kelly learned of the protected activity, and there is countervailing evidence showing that Kelly declined to interview Vander Boegh for permissible reasons. Finally, knowledge may not be imputed to Kelly based on Vander Boegh's claim that Corpstein knew of the protected activity and had influence over Kelly's decision-making. This "cat's paw" theory applies in the context of discrimination cases to impute discriminatory animus from an employee to a decision-maker, not in retaliation cases to impute the knowledge a protected activity from an employee to a decision-maker. *See Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008) (imputing discriminatory bias); *Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008) ("In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.") (citations omitted). Accordingly, I would affirm the district court's summary judgment in favor of EnergySolutions.

## II. VANDER BOEGH'S EMPLOYMENT STATUS

Additionally, I am troubled by the fact that Vander Boegh's only connection to EnergySolutions was his employment with the company that EnergySolutions supplanted. Although

EnergySolutions only raises this issue in passing, it leads me to question whether Vander Boegh has statutory standing to bring his ERA claims.

Under the ERA, "[n]o *employer* may discharge any *employee* or otherwise discriminate against any *employee* with respect to his compensation, terms, conditions, or privileges of employment because the *employee*" engaged in an activity protected by the statute. *McNeill v. U.S. Dep't of Labor*, 243 F. App'x 93, 97 (6th Cir. 2007) (internal quotation marks omitted) (citing 42 U.S.C. § 5851(a)(1)) (emphasis added). It is "a remedial statute intended to shield *employees* from adverse action taken by their *employers* in response to *employees*' complaints of safety violations." *Connecticut Light & Power Co. v. Sec'y of U.S. Dep't of Labor*, 85 F.3d 89, 93 (2d Cir. 1996) (emphasis added). *See also Hasan v. U.S. Dep't of Labor*, 298 F.3d 914, 916 (10th Cir. 2002).

Although the ERA lists examples of entities that qualify as "employers," the statute does not define the term "employee." *See* 42 U.S.C. § 5851. Nor do the relevant regulations define the term. *See* 29 C.F.R. § 24.1–24.5. Where Congress uses the term "employee" without precisely defining it, courts should presume that Congress had in mind "the conventional master-servant relationship as understood by the common-law agency doctrine." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992) (quoting *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 739–40 (1989) (holding that "In determining whether a *hired* party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished[,]" and listing several factors relevant to this inquiry). Under *Darden*, a complainant bringing an ERA retaliation claim must be a "hired party." *Demski v. U.S.*

*Dep't of Labor*, 419 F.3d 488, 492 (6th Cir. 2005) (citations omitted). *See also O'Connor v. Davis,* 126 F.3d 112, 115 (2d Cir. 1997).

In this case, the parties agree that Vander Boegh was never hired by EnergySolutions. In fact, Vander Boegh brought suit *because* he was never hired. Nor was Vander Boegh ever employed, managed, or supervised by EnergySolutions*,* and no contractual relationship otherwise existed between them. Rather, Vander Boegh's asserted right to the position is based on his claim that PRS's contract contained a provision granting "grandfathered employees" a hiring preference for vacancies. But, as the majority points out, Vander Boegh presents no evidence that he was a grandfathered employee under the new contract. Only "non-managerial" employees are considered "grandfathered" under the contract, and the landfill manager position is specifically denoted as "managerial."

Additionally, it is undisputed that Vander Boegh received no salary or wages from EnergySolutions. "Where no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist because although 'compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, . . . it is an essential condition to the existence of an employer-employee relationship.'" *O'Connor*, 126 F.3d at 115–16 (citing *Graves v. Women's Prof'l Rodeo Assoc.*, 907 F.2d 71, 74 (8th Cir. 1990)).

Therefore, I believe that EnergySolutions never "hired" Vander Boegh in "any sense that we understand the term." *Demski*, 419 F.3d at 492 (finding that the complainant, who was the owner

and sole shareholder of company that provided contract labor at DOE plant, was not an "employee" for purposes of ERA).

### III.  CONCLUSION

Because I find that there is insufficient evidence from which a jury could reasonably find that Kelly had knowledge of Vander Boegh's protected activity and because I do not believe that Vander Boegh qualifies as an employee for purposes of ERA, I respectfully dissent.